DWYER, Respondent, v. JACKSON COMPANY, Appellant.

*May 3—June 4, 1963.*

For the appellant there were briefs by *Grootemaat, Cook & Franke,* attorneys, and *Robert E. Cook* of counsel, all of Milwaukee, and oral argument by *Robert E. Cook.*

For the respondent there was a brief by *Becker, Kinnel, Doucette & Mattison,* attorneys, and *Carl R. Becker* of counsel, all of Milwaukee, and oral argument by *Carl R. Becker.*

FAIRCHILD, J. Defendant hotel owner attacks the sufficiency of the evidence to support the finding of negligence, asserts error in several particulars prejudicial with respect to liability and damage issues, claims the damage award excessive, and attacks the taxation of costs as untimely. Plaintiff challenges the court's ruling that medical bills for care of plaintiff were not shown to be her separate obligation.

1. *The finding of negligence on the part of defendant hotel owner.*

*The chair.* There are three principal members of the chair: The seat, the rear-leg member, and the backrest-

front-leg member. The backrest-front-leg member is a U-shaped piece of metal channel. The closed end of the U and a cross panel form the backrest. The open ends of the U rest on the floor and are attached by a crossbar near the floor. The rear-leg member is also U-shaped, except that the closed end is flattened, and rests on the floor. When the chair is set up for use, these two members form an X at each side of the chair, and are fastened together by a rivet at the center of each X. The seat is so arranged that pegs extending from each side of the seat, near its rear, can slide up and down in the channel in the upper portion of the backrest-front-leg member. When the chair is set up for use, the rear portion of the seat rests on a bar fastened across the backrest-front-leg member. Each end of the rear-leg member is attached by a rivet to a side of the seat, toward its front. The sliding of the pegs at the rear of the seat, and the movements permitted by the rivets, make it possible to fold and unfold the chair.

After the chair had collapsed, it was found that the rivet which attached one end of the rear-leg member to the left side of the seat had pulled out of the seat and the lower portion of the rear-leg member on that side had been bent toward the seat. It seems probable that the collapse occurred when this rivet pulled out and permitted the legs to spread apart on the left side, pitching Mrs. Dwyer in that direction. That side of the rear leg was bent because of her weight and the fact that the legs were held in their usual position on the right side of the chair.

Mr. Vogt, defendant's manager, could not say how old the chair was. The hotel had 25 to 35 similar chairs at the time of trial. He knew they were not on hand twenty-five years ago when he came, but did not know whether they were fifteen years old. The hotel never repaired chairs of this type. He testified: "As they become useless we throw

them all out, especially when they lean back on them and bow the rods and bow the backs, and they get so we toss them out." He thought they had thrown away five or six in a year.

The chair involved in this case appears to have been left in Mr. Dwyer's room for regular use at a desk. There was testimony indicating that few of these chairs were used as regular furniture, but that they were ordinarily supplied to guests who requested extra chairs for a card game or other special use.

Although Mrs. Dwyer had used the chair and said she had not considered it unsafe, she said that it would tend to be wobbly when you put your weight on it. Mr. Dwyer said it looked shabby. The Dwyers' son had been in the room on November 24th and had sat on this chair for a short time. He had remarked that it was pretty rickety. He said: "Well, when I sat in the chair, it had a swaying motion to the back end of it, just kind of twisted as I sat into it, like it was unsteady or unbalanced or something."

*The inspection.* The manager testified that no one is specially assigned to the duty of inspecting furniture for defects, but that he did so at times. He said that whenever he entered an apartment he took hold of furniture to see if it was wiggly or out of shape. He said he went into all the rooms on a general rotation basis, and got into 18 or 20 rooms in an average day, but had no distinct recollection of the Dwyer room in particular. The maid testified that whenever she discovered furniture which appeared to be unsafe or defective she would either remove it herself or call the manager. She had been in the Dwyer room daily before Mrs. Dwyer's arrival. She testified she had dusted this particular chair each day and had noticed nothing that led her to believe it was unsafe.

It is the general rule that a hotelkeeper must exercise reasonable care in providing guests with furniture which may be used in the ordinary and reasonable way without danger. His duty includes reasonable inspection. He is not liable for injury caused by a latent defect which would not have been revealed in the course of reasonable inspection.[1]

The circuit court gave instructions which were consistent with the rules just stated, including an instruction that the defective condition must have existed for such period of time that a reasonable man exercising ordinary care would have discovered it. The jury found defendant negligent in failing reasonably to inspect the chair.

We conclude that there is evidence which supports the finding. The wobbly condition of the chair was sufficiently evident to the younger Mr. Dwyer that he remarked about it and sat elsewhere. The jury could reasonably believe that an employee, making a reasonably careful inspection, would have noticed the same condition and removed the chair. The inspections made by the manager and the maid may have been deemed somewhat casual. The jury could consider that the age of the chair and the experience the hotel had had with similar chairs called for closer scrutiny.

Defendant's counsel pointed out that the seat was so constructed that the end of the rivet which pulled through could not have been seen before the accident. Plaintiff's counsel answered that if the chair swayed when sat upon, the leg would work as a lever and pull on the rivet with substantial force. The swaying of the chair and the pulling of the rivet may well have been related. The sway could have been considered sufficient to indicate a dangerous condition even if the observer could not foretell the particular manner in which the chair would give way.

---

[1] 29 Am. Jur. (1960 ed.), Innkeepers, pp. 55, 62, secs. 67, 75. Anno. 18 A. L. R. (2d) 973.

The jury evidently considered that the wobbly condition of the chair was sufficient to give warning, for they found Mrs. Dwyer negligent in using it.

2. *Damages not excessive.* Mrs. Dwyer was sixty-seven years of age at the time of the accident. She had had surgical repair of a ventral hernia in 1946, but had been in very good health in the meantime. She weighed 165 pounds. When the chair collapsed she fell backward, hitting her back and head on another chair. She had a nosebleed, and bled from her lip where her teeth cut into it. She crawled to the door and felt terrific pain, and as if her internal organs were dropping. She bled profusely from the vagina. A considerable period elapsed before she was able to get help. A large, hard bump arose on her thigh. She was taken to a hospital by ambulance and given hypos. Later she received last rites of her church. On December 9th, Dr. Haugh considered it advisable to make a further repair of her hernia. Upon surgery, he found no evidence of recent injury to the old hernia. It was, however, his opinion that there was a causal relationship between the fall and the pains experienced by Mrs. Dwyer.

Mrs. Dwyer left the hospital December 23, 1960, and was taken to Chicago. She stayed in her son's home for ten days and then returned to her own home, where she had a practical nurse for about five weeks. She testified that she had persistent pains in the lower back and down both legs. Some days she was hardly able to use her right leg. She was unable to do her housework.

Dr. Coles, an orthopedic surgeon, examined Mrs. Dwyer just before the trial. He found tender nodules about the size of walnuts under the fat in both sacroiliac regions. The cause of such nodules is not known. It was Dr. Coles' opinion that the pain in the lower back and legs was related to the fall. He explained that in cases like this the nodules are present, "but asymptomatic until a rather violent injury

occurs, at which time they are like hernias, and they are pushed—pushed out farther through the small opening in the fascia, that they pop through and they pinch a nerve, and produce pain of this nature with pain going down into the legs."

The trial began May 24, 1962, about eighteen months after the accident. There was no testimony as to the probable future continuation of the pain. The trial judge denied defendant's motion for a new trial without comment on the claim that the damages were excessive. The amount awarded for the injuries described and the discomfort experienced up to the time of trial does not appear to us to be beyond the range of reasonably debatable amounts.[2]

3. *The motion to strike Dr. Coles' testimony.* Mrs. Dwyer alleged in her complaint that she suffered "personal injury . . . rupture of a ventral hernia, pain, suffering, contusions, abrasions and disability . . . ." She failed to prove that the accident produced any rupture of the previously repaired hernia, although her physician felt an operation advisable because of the pain and tenderness in this area.

Defense counsel did not object to Mrs. Dwyer's testimony as to pain in the lower back and legs, continuing to the time of trial. He did object to Dr. Coles' testimony as to the relationship of the accident to her pain. After the close of testimony, he moved to strike both. He contended that since the complaint alleged a rupture of a ventral hernia, and that was not proved, proof of pain caused by the aggravating effect of the fall upon the nodules was beyond the scope of the complaint. He also claimed surprise.

Plaintiff's counsel asserted that at pretrial he had furnished a report of a Chicago doctor that she suffered sciatic neuritis and arthritis of the lumbosacral spine and both hips

[2] *Makowski v. Ehlenbach* (1960), 11 Wis. (2d) 38, 43, 103 N. W. (2d) 907.

as a result of her fall. Defendant had adversely examined Mrs. Dwyer before trial, but had made no request for a medical examination.

We think the allegations of the complaint were broad enough to permit proof that Mrs. Dwyer had pain in the lower back and legs as a result of the accident.[3]

We find no abuse of discretion in denying a new trial based on a claim of surprise. Although Dr. Coles' analysis of the causal connection between the accident and Mrs. Dwyer's discomfort differed from the report of the Chicago doctor, the defense sought no medical examination, nor did it call any doctor as an expert witness. It does not appear that defense counsel relied upon the diagnosis in the report.

Defendant attacks Dr. Coles' testimony as inherently incredible because he admitted that doctors do not know what causes the nodules he found. His opinion, however, was not that the accident caused the nodules, but that it so affected them as to produce pain.

Defendant also points out that reference to consultation of and medication by the Chicago physician was made in the hypothetical question to Dr. Coles, and that Mrs. Dwyer's testimony concerning her visits to the Chicago doctor were later stricken. This is all true, but it is beyond belief that Dr. Coles' answer would have been different if no reference had been made to medical treatment in Chicago.

4. *Other alleged errors.* Other claims relate to matters which were not error, or, if error, were not prejudicial, or did not involve an abuse of discretion. They are:

a. Plaintiff originally pleaded a second cause of action in contract in which she alleged that defendant agreed to supply plaintiff with safe furniture. Defendant moved that the plaintiff be required to specify whether the contract was written or oral. Plaintiff amended to plead that "it was

[3] See footnote 1, *Bublitz v. Lindstrom* (1962), 17 Wis. (2d) 608, 616, 117 N. W. (2d) 636.

orally agreed." Upon the trial plaintiff's counsel said he would rely upon "the implied representation" and asked leave to strike "orally." The court permitted it. At the close of the trial, plaintiff elected to rely on the negligence cause of action.

b. On the second day of trial, when plaintiff's proof was partially in, plaintiff moved that the pleadings be amended to conform to the proof. The court granted the motion.

c. Defendant asserts that it was error to refuse to give a requested instruction that, "A latent defect in hotel furniture such as the chair introduced as Exhibit 1 is one which is concealed, and an incident of ordinary wear, and so developed as to render discovery impossible in the exercise of ordinary and reasonable inspection and care."

The court did instruct:

"A latent defect in hotel furniture is one which reasonably careful inspection will not reveal. Latent defects which are concealed and an incident to ordinary wear and tear and so developed as to render discovery impossible in the exercise of ordinary care are casualities which no one can avoid without the exercise of extraordinary care and vigilance which duty the law does not impose upon the defendant."

d. In argument to the jury, plaintiff's counsel referred to other people having fallen from the chairs, referred to a duty of defendant to be extra careful, and referred to sciatic nerves. Objection was made to each and in each instance the court instructed the jury to disregard the remark.

e. Apparently the rivet which attached the right side of the seat to the corresponding end of the rear-leg member remained in place for eighteen months after the accident and throughout the trial and a portion of the final argument. During the final argument of defense counsel, while the chair was in his hands, this rivet also came out of its hole, and the seat fell away from the other members. No instruction was requested or given, but a motion for a new

trial in the interest of justice was grounded in part upon this event. The trial judge was best able to appraise the probable effect of this mischance upon the jury, and there is no basis on which to say that he abused his discretion in denying the motion.

A miscarriage of justice does not appear so probable as to lead us to exert our discretionary power to order a new trial.

5. *Taxation of costs.* On July 9, 1962, the court filed a written "Decision on Motions after Verdict," signed "By the Court:". In the concluding paragraph, the court stated its decision that plaintiff's motion for judgment on the verdict be granted and defendant's motion be denied. It did not specifically direct the entry of a judgment.

On September 4, 1962, the court signed and filed an "Order for Judgment" directing entry of a judgment for plaintiff against defendant in the sum of $3,690 (82 percent of the damages) plus costs.

Over defendant's objection, costs were taxed October 9th. Judgment was entered after the court reviewed and sustained the taxation by the clerk.

Sec. 270.66, Stats., reads in part:

"Within 60 days after filing of a verdict on which the clerk is authorized to enter judgment without an order, or within 60 days after an order to enter judgment is filed, the successful party may tax costs and perfect the judgment and cause it to be entered and if he fails so to do the clerk of the court shall prepare and enter the proper judgment, but without costs."

Appellant contends that the sixty-day period referred to in the statute began to run July 9th when the decision was filed, and that since the costs were not taxed before the period expired, judgment should have been entered without costs.

The decision filed July 9th was not in the ordinary form of an order for judgment; it contained no specific direction to enter judgment; except for the contention made by defendant's counsel, no one appears to have treated it as an order for judgment.[4] Although there is no reason for substantial delay in entering an order for judgment after a decision disposing of all motions after verdict, the defendant, if it desired to avoid unnecessary delay, could itself have presented an order for signature.

In our opinion, the memorandum decision was not an order to enter judgment, and sec. 270.66, Stats., clearly provides that the sixty-day period commences when "an order to enter judgment is filed." Thus the period did not start in this case until September 4th and taxation of costs on October 9th was timely.

Defendant relies on *Fonferek v. Wisconsin Rapids Gas & Electric Co.*[5] as holding that the filing of a memorandum decision without an order for judgment starts the period running. In that case the decision, the order for judgment, and judgment were all signed December 10, 1953. The decision, at least, was filed December 11th, but for some reason, the judgment was not filed until March 22d, after a judgment, without costs, had been entered by the clerk under sec. 270.66, Stats. We held that the judgment filed in March must be set aside, and the clerk's judgment reinstated. It is true that the opinion of this court indicates that the order for judgment was not filed until March 22d. Examination of the briefs on file here indicates that the parties were under the impression that the order for judgment was filed in December when the decision was filed,

---

[4] In *Estate of Baumgarten* (1961), 12 Wis. (2d) 212, 220, 107 N. W. (2d) 169, we treated a decision as an appealable order, but on the ground that in the light of the record then before us it was in fact the final ruling of the court, terminating the proceeding.

[5] (1954), 268 Wis. 278, 284, 67 N. W. (2d) 268.

and only the judgment withheld from filing.[6] Whichever version was correct, we withdraw any implication that the filing of a decision on motions after verdict, containing no direction that judgment be entered, starts the sixty-day period running under sec. 270.66.

6. *Medical and hospital bills.* Mr. Dwyer was not a party to this action. Bills were introduced, one for hospital services amounting to $895.20, and one for surgery and care amounting to $365. Both bills named Mrs. Dwyer as the obligor. Mrs. Dwyer testified she received these statements, but there was no evidence of any conversation or communication between her and the hospital or doctor concerning payment. The bills had not been paid at the time of trial. Mrs. Dwyer stated that her husband usually pays her medical bills. The doctor was originally called by the defendant at Mr. Dwyer's request. It does not appear whether he was present when she was admitted to the hospital, but it does appear that he was there shortly afterward.

Defendant objected to the bills as immaterial. The court reserved ruling, and, after the close of the trial, and in the absence of the jury, excluded them.

"The present rule is that a married woman may contract for medical services in her own right, but, in the absence of the establishment of such an express contract between the wife and the person rendering the service, the husband, and not the wife, is the person liable for such expenses and the one entitled to recover for them."[7]

[6] See Vol. 2562, Appendices and Briefs in companion case, *West Bend Mut. Fire Ins. Co. v. Wisconsin Rapids Gas & Electric Co.* (1954), 268 Wis. 278, 67 N. W. (2d) 268, appellant's brief, p. 15, and respondent's brief, p. 22.

[7] *Jewell v. Schmidt* (1957), 1 Wis. (2d) 241, 250, 83 N. W. (2d) 487.

In *Seifert v. Milwaukee & S. T. Corp.*[8] we held that certain doctor bills were to be included in the damages allowed to a married woman. One doctor had been her doctor before the accident, and before her marriage, and had always been paid by her. The other two doctors were specialists called in by the first immediately after the accident, when plaintiff was in no condition to make a contract. It was held that by later actions she ratified and approved her doctor's act.

In the record before us there is no direct evidence that Mrs. Dwyer agreed to pay the doctor or hospital or knew at the time she was receiving service that the doctor or hospital provided service in reliance upon her separate obligation to pay. Although the creation of a separate contractual obligation may be shown by circumstantial evidence, as in *Seifert,* we do not view the form of the billing, standing alone, as sufficient under these circumstances. A married woman is not able to include a hospital bill in her award of damages unless the facts would provide a basis for a successful action by the hospital against her.

We conclude that the circuit court correctly excluded these bills, and declined to add them to the award after trial.

Defendant argues that the jury must have included the amount of these bills in its allowance of $4,500 damages, and that the allowance is excessive by the same amount. The amount of each bill was mentioned when they were offered, on the first day of trial, and the amount of the doctor's bill was mentioned during the course of his testimony early on the second, and last day, of the trial. Defendant's counsel objected to the bills shortly after the time they were offered, but the court did not rule until after the close of testimony, and in the absence of the jury.

---

[8] (1958), 4 Wis. (2d) 623, 626, 91 N. W. (2d) 236.

When the jury returned, the court was about to call for final argument when defendant's counsel asked the court to "advise the jury on some matters we discussed." The court then informed the jury that testimony on a certain subject had been ordered stricken, and the jury should disregard it. The court then said, "I think that covers it, gentlemen. All right." and called on plaintiff's counsel to begin argument. It is apparent that the court failed to' instruct the jury that the medical bills had been excluded and were to be disregarded, although equally apparent that defense counsel failed to bring the omission to the court's attention.

The court having ruled as it did, we can assume that counsel did not refer to the bills in argument, and that the jury did not have possession of the bills during their deliberation. Both the damage question in the special verdict and the court's instructions concerning it were couched in general terms of damages for personal injuries. The size of the verdict does not, in our opinion, clearly indicate that the jury made its allowance in the mistaken belief that Mrs. Dwyer was entitled to recover the amount of her hospital bills. Defense counsel must share the responsibility for the oversight.

Under all the circumstances, we do not consider that this oversight justifies a new trial.

*By the Court.*—Judgment affirmed.