PEEPLES, and wife, Plaintiffs-Respondents, v. SARGENT, and others, Defendants-Appellants: ST. ELIZABETH HOSPITAL, INC., and others, Additional Defendants-Appellants.

*No. 75–152. Argued March 30, 1977.—Decided May 17, 1977.*
(Also reported in 253 N. W. 2d 459.)

616

618

620

For the appellants there was a brief by *Peter S. Nelson* and *Fulton, Menn & Nehs, Ltd.,* and oral argument by *David L. Fulton,* all of Appleton.

For the additional defendants-appellants there was a brief by *E. D. Kranzush, W. J. Ewald* and *Denissen, Kranzush, Mahoney & Ewald, S. C.,* and oral argument by *W. J. Ewald,* all of Green Bay.

For the respondents there was a brief by *Clay R. Williams, William J. French* and *Gibbs, Roper, Loots & Williams,* and oral argument by *Clay R. Williams,* all of Milwaukee.

BEILFUSS, C. J. The issues deal primarily with the sufficiency of the evidence as to the individual defend-

ants, errors as to the exclusion and admission of evidence, abuses of trial court discretion, improper jury instructions and excessiveness of damages.

The plaintiff-respondent, Richard D. Peeples, was a practicing architect in Appleton, Wisconsin. In late 1969 he experienced a dull pain in his right shoulder. Although the arm hurt when he moved it, he had no restriction of movement. In January of 1970, his personal physician referred him to Dr. James M. Sargent, one of the defendants-appellants. Calcium deposits were found in Peeples' shoulder and Dr. Sargent treated this condition with Xylocaine and Hydrocortisone injections with limited success.

Surgery to excise the calcium deposit was discussed with Mr. Peeples in July of 1970. He indicated he was reluctant to have surgery if any other treatment would take care of his condition. Surgery was performed by Dr. Sargent on September 21, 1970. Prior to surgery Peeples had no motion limitation in his right arm and hand.

In October of 1970, Dr. Sargent discovered that Peeples' pain was gone but he had a significant limitation of motion in his right arm. On November 2, 1970, Dr. Sargent discussed with Mr. Peeples a shoulder manipulation under anesthesia. Peeples stated the discussion was brief. Peeples also testified that Dr. Sargent described the manipulation "as a simple process in which I would be put under anesthetic and he would manipulate my arm in order to get rid of the muscular adhesions." Dr. Sargent stated that while Peeples was under anesthesia he intended "to move the shoulder through the various ranges where he was limited." Peeples testified Dr. Sargent mentioned no dangers or possible complications, nor did he mention the possibility of a dislocation of the shoulder. Peeples testified alternative methods of treatment were not discussed. Dr. Sargent said alternative procedures had been explored prior to discussing the manipulation. Peeples stated he probably would not have

consented to the manipulation if he had known of the possibility of dislocation.

On November 13, 1970, Peeples' shoulder was manipulated. At the conclusion of the procedure Peeples' arm was immobilized by Dr. Sargent. Peeples recovered from the manipulation with "no great discomfort." After the manipulation Peeples evidenced no nerve damage or injury to his right arm or hand but still had limitation of motion in his right arm.

A second manipulation was recommended and performed on November 27th. At the conclusion of this manipulation Peeples' arm was placed at his side by Dr. Sargent. It was not immobilized. Dr. Sargent instructed one of the attending nurses to assist Peeples in raising his arm above his head after he had regained consciousness. There was a possibility of dislocation if the arm was raised by a nurse prior to Peeples' regaining consciousness.

Barbara Marty, a registered nurse, assisted Dr. Sargent during Peeples' manipulation on November 27, 1970. She graduated from nursing school in 1969 and had been employed as a psychiatric nurse prior to being hired by St. Elizabeth's Hospital in August of 1970. She heard cracking noises in Mr. Peeples' shoulder during the manipulation. She had never seen an anterior dislocation of a humerus and had been given no training by the hospital with respect to dislocation of the humerus. Barbara Marty saw Peeples' arm raised while he was unconscious. She had no recollection of who raised the arm, nor did she remember whether she grasped the arm as it was raised. She believed the arm was raised above Peeples' head before he left the operating room. She remembered Dr. Sargent's order that someone should raise the arm but did not remember whether he stated they were to wait until Peeples regained consciousness.

Donna Stojakvic, a registered nurse, was also assigned to the operating room on the morning of November 27,

1970. She began working in the surgical department of St. Elizabeth's Hospital in September of 1970, and prior to that time she had no surgical experience beyond nursing school. She had no formal training in shoulder manipulation. She was unable to remember whether Peeples' arm was raised after the manipulation.

In addition to the two nurses, an anesthetist and Emma Maas, an operating room technician, were also present during the manipulation procedure. Maas was not a nurse but had considerable experience in shoulder manipulations. She did not believe Peeples' manipulation was an easy one and she had never before seen anyone but a doctor manipulate an arm. She heard a popping sound during Dr. Sargent's manipulation but that was normal. She heard the order to raise the arm but could not remember whether the order stated this was to be done after Peeples regained consciousness. She did not see the arm raised but remembered it as being raised when Peeples left the operating room.

When Peeples regained consciousness his right arm was above his head and he was in extreme pain. Because the pain was "excruciating," he asked for a hypo but was told he would have to wait until he was taken from the recovery room to his room.

Dr. Sargent's manipulation was completed by 8 a.m. Peeples was taken from the recovery room to his room at 8:55 a.m. Judith Keller, a registered nurse, attended Mr. Peeples after he was returned to his room in the orthopedic department. She was hired by St. Elizabeth's Hospital in June of 1970. She had not observed an anterior dislocation of the humerus. She stated that when Peeples was returned to his room he was complaining of pain. The nurses' records indicated he was hollering in pain. She did not remember seeing any deformity or unusual formation in his right shoulder area. She observed no paralysis.

Robert J. Schierl was a patient sharing the hospital room with Peeples. He heard Peeples "yelling" in the hallway as he was returning from surgery. He continued to yell and moan after he was in the room. Peeples' shoulder was uncovered and Schierl observed a white lump in his armpit that was the size of a baseball with the top shaved off. He heard one nurse ask another— "What's wrong with his arm?" At lunch time Peeples was still yelling but not as frequently.

Virginia Boneck was head nurse on the orthopedic floor on November 27, 1970. She administered a hypo to Peeples about 8:55 a.m., because of his pain. At 9:30 another hypo was given. Dr. Sargent was notified. She did not examine Peeples' armpit or shoulder but knew that was the location of the pain.

Peeples was taken to physical therapy for range of motion exercises about 10:30 a.m. The physical therapist wrote a report which stated "the humerus moved out of joint" twice. Dr. Sargent was notified and the exercises were terminated. Peeples testified that after moving his arm the therapist stated—"I think it's dislocated."

After being returned from physical therapy there was a change in the feeling in Peeples' arm and shoulder. They began to be numb and it seemed like his hand was becoming dead. He was in extreme pain and so informed the nurses.

When Dr. Sargent returned to the hospital about 11:30 a.m., he was able to tell from across the room that Peeples had a dislocated shoulder. Schierl testified that Dr. Sargent said "they must have dropped him." Dr. Sargent concluded Peeples was suffering from a complete brachial plexus palsy. Complete brachial plexus palsy results in loss of all sensation and all motor ability of the arm. Peeples couldn't move his hand and had no sensation in his arm. Peeples was taken to the x-ray room and then to the operating room where Dr. Sargent re-

duced the dislocation and put the shoulder back in the socket.

Mrs. Peeples testified that when Peeples was released from the hospital he was despondent and was in great pain; he had great difficulty sleeping. Mrs. Peeples did not work prior to the injury but was running a boarding house at the time of trial to assist in supporting the family, which included two minor children.

Mr. Peeples is an architect. He is right handed. He continued working after the shoulder dislocation but his effectiveness was substantially reduced. He attempted to teach himself to draw with his left hand. At trial he still suffered from lack of motion in his arm, stiffness and numbness of hand and fingers, and spasms in his hand.

In 1969, as a partner in his own architectural firm, Mr. Peeples earned over $26,000. In 1970 he earned over $28,000. In 1971 he had no income; he was able to pay a draftsman hired to assist him and a secretary. He earned almost $5,000 in 1972 and $13,000 in 1973. In 1974 he was employed by a Milwaukee architectural firm and anticipated earning $14,000. Peeples began his own architectural firm in May of 1960, prior to the dislocation.

Mr. Peeples' former partner, James Zwack, testified that Peeples was unable to run a successful architectural business on his own. He found Peeples to be impractical. However, other evidence was introduced which tends to dispute this conclusion.

Dr. Carroll B. Larson, a well qualified orthopedic specialist, was called by the plaintiffs and testified that the limitation of motion in the shoulder was permanent. He also stated the limitation would affect Peeples' ability as an architect. He believed Peeples' condition was caused by Dr. Sargent's negligence. Dr. Sargent stated that when he concluded treatment of Peeples in May of 1972 the healing process had not been completed.

The jury found Dr. Sargent negligent with respect to medical services rendered and found such negligence causal of Peeples' injuries. It also found Nurses Marty, Stojakvic, Keller and Boneck negligent in the nursing services rendered and that the negligence was causal of Peeples' injuries. It also found St. Elizabeth Hospital causally negligent. It found that another nurse and Emma Maas, the operating room technician, were not negligent.

The causal negligence was apportioned as follows: Dr. Sargent—20 percent; each of the four nurses—19 percent; and the hospital—four percent. Judgment was entered in favor of the plaintiffs on March 17, 1975.

The nurses argue that there is no credible evidence in the record to support a finding of negligence on their part. The hospital makes the same argument.

As the respondents point out, if there is any credible evidence to support findings of causal negligence this court will not overturn that finding.[1] However, "a verdict cannot stand on conjecture, unproved assumptions, or mere possibilities." *Schwalbach v. Antigo Electric & Gas, Inc.,* 27 Wis.2d 651, 655, 135 N.W.2d 263 (1965). Moreover, special weight is given the jury's findings where, as here, they have had the specific approval of the trial court.[2] The trial court found "ample credible evidence" to support the finding of negligence on the part of the nurses and hospital.

Elaine Ellibee, a registered nurse employed by the State of Wisconsin as Secretary of the Board of Nursing and Administrator of the Division of Nursing, testified concerning nursing standards in Wisconsin as set forth in ch. 441 of the statutes. She testified a nurse is re-

[1] *Leatherman v. Garza,* 39 Wis.2d 378, 386, 159 N.W.2d 18 (1968).

[2] *Burke v. Poeschl Brothers, Inc.,* 38 Wis.2d 225, 239, 156 N.W.2d 378 (1968).

sponsible for: management, observation, comfort and safety of the patient; reporting anything unusual about the patient; taking whatever action is necessary on the basis of the observation of the patient; and accurately recording in detail observations about the patient. It was her opinion that Peeples' hospital record did not demonstrate that the hospital and nurses exercised usual care in observation and action, and that there was a failure to carry out expected nursing practices. She believed this failure caused a delay in Peeples' receiving timely medical treatment. She also testified that the hospital failed to exercise appropriate care in assigning two nurses who had little or no experience in shoulder manipulations and who had only been employed as operating room nurses for three and four months prior to this manipulation.

Dr. Bruce Brewer, an orthopedic surgeon called by the appellants, testified that unless directly ordered by the doctor he did not think a licensed nurse with three months surgical practice should raise the arm of a patient postmanipulatively while he is still unconscious in the operating room. Dr. Sargent testified that he instructed one of the nurses to raise Peeples' arm after he regained consciousness. No one present in the operating room could remember who raised the arm.

Dr. James H. Dobyns, an orthopedic surgeon from the Mayo Clinic in Rochester, Minnesota, testified by deposition that an anterior dislocation of the humerus is "a rather obvious deformity" which he would expect a trained orthopedic nurse to notice. There is no evidence that the dislocation was recognized by Nurse Keller or Nurse Boneck, yet Dr. Sargent recognized it immediately upon entering the room.

One or both of the operating room nurses raised Peeples' arm before the regained consciousness. Both nurses were present when Sargent gave the instruction not to raise the arm until Peeples regained consciousness. The nurses on the orthopedic floor failed to dis-

cover the shoulder dislocation. The records kept by the nurses were thought to be inadequate by Elaine Ellibee. She explained that such records were necessary in order to maintain continuity of care. It was her opinion that the hospital was also negligent in assigning inexperienced nurses. She also testified that the negligence caused a delay in receiving timely medical treatment.

We conclude there was credible evidence to support the findings of negligence on the part of the nurses and the hospital.

The nurses argue that the trial court committed prejudicial error in sustaining an objection to a question addressed to Dr. Kenneth Viste, a neurologist who treated Peeples after a referral by Dr. Sargent. The question asked by counsel for the doctors was whether, during the course of treatment, Dr. Viste arrived "at any psychiatric conclusions with respect to" Peeples. Peeples' counsel objected that the question was in the nature of an affirmative defense and had not been pleaded. Counsel also objected that Peeples had not seen Dr. Viste for psychiatric treatment. Counsel had previously objected to Dr. Viste's testimony because there was no notice that Dr. Viste would be called as an expert. The objection to psychiatric treatment was sustained.

Counsel for Evelyn Massonette, the operating room supervisor who is not a party to this appeal, then questioned Dr. Viste and attempted to elicit testimony on the emotional state of Peeples while he was receiving treatment. This testimony was excluded and an offer of proof was made by Mrs. Massonette's counsel. Dr. Viste was of the opinion that Peeples was not making the progress he should have because he was not motivated. He believed Peeples' emotional state prevented him from recovering as rapidly as he should have. None of Dr. Viste's testimony concerning Peeples' emotional state was reflected in his treatment records. The trial court was of the opinion that Dr. Viste's testimony was colored and

not credible because of an animosity Dr. Viste had for Peeples because his services had not been paid for.

The court denied the offer of proof and the motion for mistrial made by the attorneys for the doctors, the nurses and Mrs. Massonette. The credibility of witnesses is, of course, for the jury but the objection to this testimony was sustainable on other grounds.

Dr. Viste was called as a witness by the doctors. The doctors' theory of the case was that there was no negligence on their part. The testimony of Dr. Viste, which the court prevented from going to the jury, did not deal with absence of negligence. The testimony of Peeples' emotional state concerned his failure to mitigate damages. Failure to mitigate damages must be pled; if it is not pled it is waived as a defense.[3] No affirmative defenses were pled; therefore the court did not err in sustaining an objection to Dr. Viste's testimony as to either the nurses or the doctor.

Dr. Sargent's counsel argue that Dr. Carroll B. Larson should not have been allowed to testify because he changed his opinion from the time of his deposition to the time of trial. Dr. Larson was deposed on July 12, 1974, in Iowa City, Iowa. The taking of the deposition took slightly less than a half hour. Dr. Larson was asked, based upon his examination of Peeples, the case history he took and the depositions he read, whether he had "an opinion on reasonable medical probability as to whether or not Dr. Sargent was guilty of committing malpractice." Peeples' counsel objected on the ground that the term "guilty of malpractice" was improper. Dr. Larson stated there were several points "as to what I consider areas of possible malpractice, as you put it." He enumerated these points and clarified his comment by stating

---

[3] *Howard v. State Farm Mut. Automobile Liability Ins. Co.*, 70 Wis.2d 985, 991, 236 N.W.2d 643 (1975); *Kennedy-Ingalls Corp. v. Meissner*, 11 Wis.2d 371, 387, 105 N.W.2d 748 (1960).

he was not making an absolute judgment. Counsel then asked whether Dr. Larson was in a position to say that Dr. Sargent was guilty of malpractice. Peeples' counsel again objected to the term "guilty of malpractice." Dr. Larson responded—"I'm unwilling to say." Peeples' attorney suggested that the question would more appropriately be whether or not Dr. Larson had an opinion based on a reasonable degree of medical certainty. The deposition then terminated. At trial Dr. Larson testified that in his opinion, to a reasonable degree of medical probability, Dr. Sargent's treatment of Peeples was a failure to exercise that degree of care which is usually exercised by reputable physicians in orthopedic surgery under like or similar circumstances.

Dr. Sargent cites a number of cases decided by this court which deal with pretrial discovery.[4] He argues that because Peeples' counsel did not disclose that Dr. Larson changed his opinion he should not have been allowed to testify. We believe this argument fails for two reasons. First, ch. 887, Stats. (1973), which controlled depositions at the time Dr. Larson was deposed, made no provision for supplementing answers to a deposition.[5] There was a duty to supplement incorrect answers to interrogatories, sec. 887.30(6), Stats., but no

---

[4] *Kletsch v. Waukesha County*, 61 Wis.2d 662, 213 N.W.2d 367 (1974); *Blakely v. Waukesha Foundry Co.*, 65 Wis.2d 468, 222 N.W.2d 920 (1974).

[5] Sec. 804.01(5), Stats., which became effective January 1, 1976, states that a party has a duty "to amend a prior response if the party obtains information upon the basis of which 1. the party knows that the response was incorrect when made, or 2. the party knows that the response though correct when made is no longer true and the circumstances are such that a failure to amend the response is in substance a knowing concealment." Even under this change in the law there is no general duty to supplement all responses.

such provision applied to depositions.[6] Peeples had no obligation to inform Sargent's counsel that Dr. Larson had a different opinion than he did when deposed. Second, it is not clear that Dr. Larson changed his opinion. During an offer of proof made at trial, Dr. Larson was asked whether the term "guilty of committing malpractice" meant the same thing as "[d]id Dr. Sargent fail to exercise in his treatment of the plaintiff that degree of care, skill and judgment normally exercised by competent orthopedists at the time considering the advanced state of medicine?" Dr. Larson responded that he did not believe they meant the same thing and explained how the terms differed in his mind.

When asked in the presence of the jury whether, at the time of the deposition, he did not have an opinion as to whether Dr. Sargent failed to exercise "that degree of care, skill and judgment that is normally exercised by competent orthopedists. . . ," Dr. Larson replied—"I don't think that is true. I think I did have an opinion." Because at that time there was no duty to disclose that Dr. Larson changed his opinion and, more importantly, because it is not clear that Dr. Larson did change his opinion, the trial court did not err in permitting Dr. Larson to testify.

It further appears that in determining Dr. Larson could testify, the trial court stated the alleged change of opinion could be "fully explored" on cross-examination. The doctors argue that rulings made by the court prevented such an exploration. On cross-examination of Dr. Larson, the court, following repeated objections by Peeples' counsel, prevented reading questions in the deposition that used the term "guilty of malpractice." The basis of the court's ruling was that the use of that term would confuse the jury. The court stated that saying

---

[6] Graczyk, *The New Wisconsin Rules of Civil Procedure: Chapter 804,* 59 Marq. L. Rev. 463, 476 (1976).

"guilty of committing malpractice [is] almost like saying 'guilty of committing murder, or burglary,' and that isn't involved in this case at all."

Sec. 904.03, Stats., specifically provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of . . . misleading the jury. . . ." Normally there would be no question that the court's ruling was proper, but the practical effect of excluding questions that contained the statement "guilty of malpractice" was to preclude the doctor's counsel from reading questions and answers from the deposition in an attempt to impeach Dr. Larson. Because of the effect of the ruling, a closer examination is in order. At the time the question was initially asked, Peeples' attorney objected to the form of the question. The option of rephrasing the question was available but counsel chose not to do so. He accepted Dr. Larson's answer and ended the deposition. Rather than rephrase the question he apparently gambled that Dr. Larson's answer was the "knockout punch" needed.

The doctors cite a number of jury instructions and cases where the terms "guilty of malpractice" or "guilty of negligence" were used.[7] These examples make it clear that the trial court was not bound to sustain the objection, but it was within the court's discretion, if it believed the term would confuse the jury, to sustain the objection to the form of the question and refuse to allow the term "guilty of malpractice" to be used. We agree with the trial court that the descriptive word "guilty" can have an inappropriate connotation where subject of the inquiry is whether an individual is negligent. The doctors were warned by objection, at the time of the deposition, that the question might be objected to. It was

[7] *E.g., Nimmer v. Purtell*, 69 Wis.2d 21, 31–32, 230 N.W.2d 258 (1975); Wis J I—Civil, Part I, 1007.

not the court which limited their cross-examination but their own trial tactics.

The doctors also argue that the court gave defense counsel no opportunity to rephrase the question concerning whether Dr. Larson had a prior inconsistent opinion regarding the issue of malpractice. We do not believe that this argument is borne out by the record.

The last argument of the doctors concerning Dr. Larson's testimony is that it offered no basis for a finding of negligence on the part of Dr. Sargent. From our review the record does not support this argument.

Dr. Larson testified to the national standard of care of an orthopedic surgeon to the period ending in May of 1971. After a lengthy hypothetical question concerning the treatment of Peeples, Dr. Larson gave a detailed statement specifically pointing out how the standard of care had not been followed. He believed Dr. Sargent was negligent in not examining Peeples immediately after he regained consciousness. He stated in his opinion that delegating the nurse to move Peeples' arm was also negligent. Dr. Larson testified that before a manipulation of a shoulder under general anesthetic the patient must be informed of alternatives to the procedure as well as medically significant risks. His testimony indicated his belief that the dislocation occurred during the manipulation and he believed Dr. Sargent failed to meet the standard of care of orthopedic surgeons in the long delay before correcting the dislocation.

The hospital argues that the court erred in refusing to give the jury instruction it had requested in writing and in substituting another instruction. The hospital's instruction was brief, stating that it was required to exercise such reasonable care and attention for the patient as his condition may have required. The court gave an instruction taken from ch. 24 of the Wisconsin Admin-

istrative Code dealing with the duties of the hospital. The court characterized the rules as safety regulations and stated that a violation of the rules was negligence.

In *Blanchard v. Terpstra,* 37 Wis.2d 292, 299, 155 N.W.2d 156 (1967), this court stated that a safety statute "merely establishes a minimum standard of care and the conduct, even though sanctioned or in conformity with the statute, is not thereby necessarily relieved of conforming to the common-law requirements of ordinary care." The implication of the instruction was that if the hospital conformed with the regulations set forth in the Wisconsin Administrative Code, it exercised ordinary care and was not negligent. One may satisfy a safety standard and still not exercise ordinary care under the circumstances. The safety standard is a minimum; there may be a duty to go beyond that minimum. Thus if anyone was entitled to complain about this instruction it was Peeples, not the hospital.

Additionally, one objecting to an instruction must do so specifically, thereby pointing out the particular error of the instruction to the court.[8] The hospital did make a specific objection to the instruction, stating that "if there were any violations of those administrative regulations, that they are not proximately causal, as a matter of law." This is not the argument the hospital makes on appeal. It raises for the first time the argument that the instruction implied an increased duty of care and was so lengthy that it unfairly emphasized Peeples' theory of the case. We do not find the instruction was too lengthy, nor did it imply an increased duty of care. Further, these objections to the instructions were not brought to the attention of the trial court. It did not have an opportunity to consider these objections or make corrections if appropriate.

[8] *Terpstra v. Soiltest, Inc.,* 63 Wis.2d 585, 594, 218 N.W.2d 129 (1974).

The hospital argues that the court erred in advising the jury that H24.12(1)(a)8 of the Wisconsin Administrative Code required an operative report shall be written immediately following the surgery, but failed to state that it could be dictated immediately after the surgery. This point is well taken. However, there is no evidence indicating that an operative report was dictated immediately after surgery. Dr. Sargent dictated an operative report. The date on the report was February 19 of 1971. Dr. Sargent testified that that date could have been the date the report was transcribed or the date it was dictated; he had no recollection of when the report was dictated. Whatever the date of dictation, the clear import of the rule is that an operative report be available to the hospital shortly after the surgery. This was not done here. If the omission of the words "or dictated" was error, it was harmless.

The hospital argues that the court erroneously paraphrased H24.05(1)(c)1, dealing with nursing personnel other than nurses, because the dispute was whether the hospital had provided sufficient training and supervision of operating room nurses. Again the hospital is correct. However, the hospital requirement as to furnishing trained and competent nurses as provided in H24.05(1)(c) is essentially the same as the instruction given. The instruction given was not erroneous.

The doctors contend that a new trial should be granted on the question of Dr. Sargent's negligence. They argue that because there was no specific instruction on the relationship between informed consent and cause it is impossible to tell whether the answers to negligence and cause questions of the special verdict related to negligent care and treatment, failure to give informed consent, or both.

In instructing the jury the court stated that the first question dealt with whether Dr. Sargent was negligent and the second question with whether such negligence was a cause of Peeples' injury. The court emphasized that only if Question 1 was answered "Yes," thereby finding Dr. Sargent negligent, should the second question be answered. The court then gave a negligence instruction. It followed that instruction with the following informed consent instruction.

"The physician and surgeon has a duty to make reasonable disclosure to his patient of all significant facts under the circumstances of the situation which are necessary to form the basis of an intelligent and informed consent by the patient to the proposed treatment or operation, and the patient must have given such consent to the operation. This duty, however, is limited to those disclosures that physicians and surgeons of good standing in that specialty would make under the same or similar circumstances, having due regard to the patient's physical, mental and emotional condition.
"If you find that the plaintiff has sustained his burden of establishing non-disclosure, then the burden of going forward with evidence justifying such failure then passes to the defendant doctor."

The court then gave the cause instruction:

"If you answer Question No. 1 'yes,' then answer this question:
"Was such negligence of the defendant, James M. Sargent, a cause of plaintiff's, Richard Peeples, injuries?
"The negligence of one person alone may produce injury, or the acts or omissions on the part of two or more persons, or other conditions beyond anyone's control may jointly produce the injury. Before the relationship of cause and effect can be found to exist, it must appear that the negligence of the defendant doctor, if found by you, was a substantial factor in producing the resulting disability. That is to say, it was a factor actually operating and which had substantial effect in producing the disability as a natural result.

"Now, the evidence in this case indicates without dispute that when the plaintiff obtained the services of the defendant doctor and placed himself under his care, he was then suffering from some disability resulting from a condition that he had at that time. His then physical condition can not be regarded by you in any way as having been caused or contributed to by any negligence on the part of the defendant doctor. This question asks you to determine whether the condition of the plaintiff's health as it was when he placed himself under the doctor's care has been aggravated or further impaired as a natural result of the negligence of the defendant doctor's treatment of him. If you believe from the evidence that the present condition of the plaintiff's health may have been caused either by the defendant's negligence in treatment or by the processes and developments of his prior illness, and if you are uncertain as to which is responsible, then you may not find that the defendant's negligence was a cause of the plaintiff's present condition of health."

After the trial in this case, this court decided *Scaria v. St. Paul Fire & Marine Ins. Co.*, 68 Wis.2d 1, 227 N.W.2d 647 (1975). In *Scaria* the trial court had limited the doctor's duty to disclose in the same fashion as it was limited in this case. Such a limitation was held to be too broad. A doctor was held to have a duty "to make such disclosures as appear reasonably necessary under circumstances then existing to enable a reasonable person under the same or similar circumstances confronting the patient at the time of disclosure to intelligently exercise his right to consent or to refuse the treatment or procedure proposed." *Id.* at 13.

Therefore an initial observation is that Dr. Sargent benefited from an instruction which set forth a "too broad" limitation on his duty to disclose. It was Peeples, not the doctors, who was entitled to complain about this portion of the instruction.

However, the doctors note that the instruction did not inform the jury that there must be a causal relationship between the physician's failure to make such disclosures and the harm to Peeples. Such an instruction would have been appropriate and courts should make the causal relationship clear.[9] While such an instruction was not specifically given, this is insufficient ground for reversal for two reasons. First, failure to make reasonably necessary disclosures to a patient is a form of negligence. The jury was instructed that unless the negligence was a substantial factor in the resulting injury it should not answer Question 2, concerning cause, yes. The jury answered Question 2 "Yes." It is not necessary for a court to be able to determine whether this cause resulted from negligence in treatment or negligence in failing to make reasonable disclosures under the circumstances.[10] Wisconsin has eliminated the requirement that there be a specific inquiry to items of negligence and permits a general (ultimate fact) inquiry with respect to negligence. Sec. 270.27, Stats.[11]

The second reason that the instructions on negligence and cause are not ground for reversal is that the doctors requested no specific instruction stating that there must be a causal relationship between failure to make reasonable disclosures and the injury suffered. Nor did they object to the failure to include such an instruction.[12] Nor did the doctors, in their motions after verdict, object

[9] *Trogun v. Fruchtman,* 58 Wis.2d 569, 602–03, 207 N.W.2d 297 (1973).

[10] Decker and Decker, *Special Verdict Formulation in Wisconsin,* 60 Marq. L. Rev. 201, 230 (1977).

[11] *Id.* at 213–14.

[12] *See Heldt v. Nicholson Mfg. Co.,* 72 Wis.2d 110, 114, 240 N.W.2d 154 (1976).

to the failure to give such an instruction with the required specificity.[13]

The doctors also argue that the court erred in stating if the plaintiff sustained "his burden of establishing nondisclosure, then the burden of going forward with evidence justifying such failure then passes to the defendant doctor." There was no error in this instruction; it is modeled on language of this court as it appears in *Trogun v. Fruchtman*, 58 Wis.2d 569, 602, 207 N.W.2d 297 (1973).

The nurses and the hospital argue that the damages were excessive. Evidence on damages is reviewed in the light most favorable to the verdict.[14] This rule has special application where the trial court has reviewed the evidence supporting the verdict and approved the verdict.[15] Courts should be, and are, reluctant to interfere with a jury verdict.[16] The trial court found "the damages awarded were well within a range that the jury could have found."

The jury found $65,000 compensated Peeples for his personal injuries. This sum included any impairment of his future earning capacity as a natural consequence of his injuries. The jury found $45,000 compensated Peeples for his loss of earnings to the time of the verdict.

There was extensive testimony concerning the pain suffered by Peeples. There was also testimony that the

[13] *Terpstra v. Soiltest, Inc.*, 63 Wis.2d 585, 594, 218 N.W.2d 129 (1974).

[14] *Burke v. Poeschl Bros., Inc.*, 38 Wis.2d 225, 239, 156 N.W.2d 378 (1968).

[15] *Erdmann v. Milwaukee Automobile Mut. Ins. Co.*, 20 Wis.2d 439, 446, 122 N.W.2d 430 (1963).

[16] *Grassl v. Nelson*, 75 Wis.2d 107, 114, 248 N.W.2d 403 (1977).

residual disabilities caused by the injury were permanent. Dr. George Meadows, a Ph.D. in Economics, testified that Peeples' loss of earning capacity was equal to $250,911. The evidence is sufficient to substantiate the jury's conclusion concerning his pain and suffering, personal injuries and loss of earnings both before and after trial.

The jury awarded Mrs. Peeples $5,000 for loss of society and companionship. The evidence in the record concerning the loss of companionship and consortium, the increased care of her husband, the responsibility for their children, and the change in her social position more than amply justify the award of $5,000.

The doctors argue that Peeples' claim for medical expenses and Mrs. Peeples' claim for loss of consortium were barred by their adjudication as bankrupt prior to trial.

The issue is whether, after adjudication as bankrupt, the medical expenses claim is that of the injured party or of the bankruptcy trustee. That is the same question concerning Mrs. Peeples' claim for loss of consortium. After bankruptcy, was the cause of action hers or the trustee's? These questions are controlled by 11 USCA, pp. 9–10, sec. 110(a), which reads in pertinent part as follows:

"(a) The trustee of the estate of a bankrupt and his successor or successors, if any, upon his or their appointment and qualification, shall in turn be vested by operation of law with the title of the bankrupt as of the date of the filing of the petition initiating a proceeding under this title, except insofar as it is to property which is held to be exempt, to all of the following kinds of property wherever located. . . . [R]ights of action ex delicto for libel, slander, injuries to the person of the bankrupt or of a relative, whether or not resulting in death, seduction, and criminal conversation shall not vest

in the trustee unless by the law of the State such rights of action are subject to attachment, execution, garnishment, sequestration, or other judicial process."

"Consortium involves a broad range of elements such as love, companionship, affection, society, sexual relations, and the right of support or the performance of marital services, any one of which is sufficient to constitute a cause of action." *Schwartz v. Milwaukee*, 54 Wis.2d 286, 292, 195 N.W.2d 480 (1972). The cause of action for consortium occasioned by an injury to one marriage partner is a separate cause of action belonging to the spouse of the injured marriage partner. *Id.* at 293. A wife's loss of consortium cause of action is derivative "in the sense it arose out of or was occasioned by an injury to her husband." *Id. accord White v. Lunder*, 66 Wis.2d 563, 574, 225 N.W.2d 442 (1975). However, loss of consortium is a direct injury to the spouse who has lost the consortium.

Because both the medical expenses claim and the loss of consortium are personal injury rights of action they do not vest in the trustee unless by the law of Wisconsin such rights " 'are subject to attachment, execution, garnishment, sequestration, or other judicial process.' " In *In re Buda*, 323 F.2d 748 (7th Cir. 1963), the Seventh Circuit Court of Appeals held that under Wisconsin law a personal injury right of action did not pass to the trustee.[17]

A holding that neither the medical expenses claim nor the loss of consortium cause of action vested in the trustee would be in conformance with one policy of the

[17] *Accord: In re Schmelzer*, 480 F.2d 1074 (6th Cir. 1973); *Saper v. Delgado*, 146 F.2d 714 (2d Cir. 1945). *Contra: Carmona v. Robinson*, 336 F.2d 518 (9th Cir. 1964).

Bankruptcy Act. The policy "seeks to secure for creditors everything of value the bankrupt may possess in alienable or leviable form when he files his petition, but avoids 'to coin into money for the profit of his creditors the bodily pain, mental anguish or outraged feelings of a bankrupt.'" *Nichols v. United States Fidelity & Guaranty Co.,* 37 Wis.2d 238, 247, 155 N.W.2d 104 (1967). In any event the trustee has assigned any claim he might have in this regard to the plaintiffs. Therefore the damages for medical expenses and for loss of consortium were appropriately included in the judgment.

The doctors argue that a new trial in the interest of justice should be granted. The doctors direct this court's attention to the trial court's opinions about Dr. Viste and James Zwack as they were set forth in his Decision on Motions After Verdict. The doctors do not argue that the court in any way influenced the jury concerning these witnesses, but rather that during an offer of proof the court stated it did not believe Dr. Viste and that this had a chilling effect on prospective witnesses. The court's purported attitude toward these witnesses is not ground for a new trial. It is not shown that a different result is probable if a new trial was ordered.

The doctors also cite the court to three exchanges between the trial court and Dr. Sargent. One of these exchanges was entirely proper. The court merely advised Dr. Sargent to allow Peeples' counsel to run his case. One of the other colloquies was initiated by Dr. Sargent's self criticism concerning the length of his answer. The court agreed and admonished Dr. Sargent to answer the questions and to do no more than that. A similar admonishment was given on a third occasion. In so doing the court was well within its authority. Secs. 906.11(1) and 906.14(2), Stats. With the benefit of hindsight it is easy to say that the admonitions given would have been

sufficient had they not been reiterated once or twice after initially made. But taken in the context of a ten day trial, these admonitions were not of such consequence that it can be said the judge appeared to be partisan.[18]

The doctors also argue that it was error to allow Dr. Larson to testify to the possibility of permanent nerve damage. Dr. Larson had previously testified that the limitation of motion in Peeples' arm was permanent. The testimony that nerve damage was only possibly permanent did not harm Dr. Sargent. It was made clear that Dr. Larson could not say that it was probable that the nerve damage was permanent.

The doctors also object to the court's use of the phrase "sustained as a result of the treatment by Dr. Sargent" when discussing the damages question with a juror. Put in its proper context, it is clear that the court was only instructing the jury not to consider any injury from which Peeples was suffering prior to being treated by Dr. Sargent. Finally, it is argued that the number of dissenters indicated the jury did not understand the case. The jury arrived at a proper verdict; it is apparent it understood the case. None of the arguments of the doctors, either considered alone or cumulatively, are grounds for a new trial in the interest of justice.

In concluding a thorough and comprehensive memorandum opinion on the motions after verdict, the trial court stated:

"All in all, I am of the opinion that there is ample credible evidence to support all the answers reached by the jury in connection with all the defendants. I am further satisfied that no prejudicial or reversible error was committed during the course of the trial."

[18] *See generally: State v. Garner,* 54 Wis.2d 100, 104, 194 N.W.2d 649 (1972).

We agree.

Dr. Finn O. Gunderson was joined as a party defendant. He was dismissed from the case at the conclusion of the plaintiffs' case. After judgment was entered he attempted to tax costs but the court disallowed his costs —"Where several defendants appear with the same or different counsel and they present the same answers and defenses they are entitled to but a single attorney's fee on the entry of judgment for them."[19] Here four defendants appeared with the same counsel and answered as one. Three defendants lost and one prevailed. Thus it would seem that at least the one that prevailed could tax *his* costs. An examination of the bill of costs and attached exhibits demonstrates that Dr. Gunderson did not attempt to tax only his costs but those of all four doctors.

The argument that his costs should not be allowed because Dr. Gunderson did not tax costs timely should be rejected. He filed his bill of costs within 60 days after the order to enter judgment was filed. He complied with sec. 270.66, Stats.[20] Dr. Gunderson should be permitted to prepare an itemized amended bill of his costs that are properly attributable solely to his defense.

The plaintiffs, Mr. and Mrs. Peeples, argue that the appellant-doctors' brief violated the rules of this court. We agree. Sec. 251.34(3), Stats., requires a reference to the appendix on any statement of fact to which there is a possibility of dispute. The doctors' brief contained no references to the appendix or record in the statement of facts. The manner in which the facts were presented

---

[19] *Appliance Buyers Credit Corp. v. Crivello,* 43 Wis.2d 241, 259, 168 N.W.2d 892 (1969).

[20] *See Dwyer v. Jackson Co.,* 20 Wis.2d 318, 328–30, 121 N.W.2d 881 (1963).

left great room for dispute. Additionally, reference to Robert Schierl's testimony was alluded to in the statement of facts. Schierl's testimony was extremely significant to this case. He was a disinterested witness who saw that which the nurses failed to see, both as to Peeples' obvious physical condition and the pain he was enduring. While there has been a violation of appellate procedure, in view of the outcome of the case, in our discretion we will not penalize the defendants.

Finally, the plaintiffs argue that counsel for the appellants failed to comply with the jurisdictional requirements for an appeal in that the Notice of Appeal was not signed by the appellants or the appellants' attorney as is required by sec. 274.11, Stats. They argue that the appeal should be dismissed. Earlier the Peeples brought a motion to dismiss. The argument they bring at this time should have been raised when they made their motion to dismiss. By not doing so they waived this argument.

*By the Court.*—Judgment affirmed except as it relates to taxation of costs to the dismissed defendant, Dr. Finn O. Gunderson, and in that respect reversed and remanded for further proceedings not inconsistent with this opinion. Plaintiffs permitted to tax appeal costs.