Joseph FINNEGAN, Tanice Finnegan, Calvin Joseph Finnegan, Zachary Trevor Finnegan and Mikayla Fae Finnegan, by their Guardian ad Litem, David M. Skoglind, Plaintiffs-Respondents,

MANITOWOC PUBLIC SCHOOLS SELF-INSURED, c/o Plan Administrators Humana Employers Health, Involuntary-Plaintiffs,

v.

WISCONSIN PATIENTS COMPENSATION FUND, Defendant-Co-Appellant,

MANITOWOC CLINIC INCORPORATED and ABC Insurance Company, Defendants,

AURORA MEDICAL GROUP, INC. d/b/a Manitowoc Clinic and Aurora Health Care, Inc., Defendants-Appellants.

Supreme Court

*No. 01–2911. Oral argument December 4, 2002.— Decided July 8, 2003.*

2003 WI 98

(Also reported in 666 N.W.2d 797.)

For the defendants-appellants there were briefs by *Randal N. Arnold, David J. Hanus* and *Hinshaw & Culbertson,* Milwaukee, and oral argument by *Randal N. Arnold.*

For the defendant-co-appellant there were briefs by *R. George Burnett* and *Liebmann, Conway, Olejniczak & Jerry, S.C.,* Green Bay, and oral argument by *R. George Burnett.*

For the plaintiffs-respondents there was a brief by *Timothy J. Aiken, James C. Gallanis,* and *Aiken & Scoptur, S.C.,* Milwaukee, and oral argument by *Timothy J. Aiken.*

An amicus curiae brief was filed by *Martha H. Heidt* and *Doar, Drill & Skow, S.C.,* Baldwin, on behalf of the Wisconsin Academy of Trial Lawyers.

¶ 1. DIANE S. SYKES, J. We have this case on certification from the court of appeals for resolution of two issues: 1) does Chapter 655 of the Wisconsin Statutes (1999–2000),[1] which exclusively governs medical malpractice claims in this state, permit a bystander claim for negligent infliction of emotional distress in a medical malpractice lawsuit; and 2) if such a claim is statutorily permitted, does a misdiagnosis leading to the patient's eventual death give rise to a claim for negligent infliction of emotional distress under *Bowen v. Lumbermens Mut. Cas. Co.,* 183 Wis. 2d 627, 517 N.W.2d 432 (1994), where the claimant witnessed the patient's physical deterioration but did not witness an injury-producing event or its immediate aftermath?

¶ 2. Three members of the court—Justice Wilcox, Justice Prosser and the author of this lead opinion—conclude that Chapter 655 does not permit bystander claims for negligent infliction of emotional distress in medical malpractice lawsuits. Two members of the court—Justice Bablitch and Justice Crooks—conclude that bystander claims for negligent infliction of emotional distress are derivative claims that fall within and are actionable under Chapter 655. One member of the court—Chief Justice Abrahamson—concludes that if a *Bowen* bystander claim is an independent cause of

[1] All subsequent references to the Wisconsin Statutes are to the 1999–2000 version.

action, it can be brought outside Chapter 655. Justice Bradley takes no position on the statutory question, concluding instead that the second certified question is dispositive.

¶ 3. The second issue on certification is a common-law question regarding whether a bystander claim can be maintained under *Bowen* where the injury-producing event is somewhat attenuated from the physical manifestation of injury and death that was witnessed by the claimant. Three members of the court (Justice Wilcox, Justice Prosser, and I) have concluded that this claim is statutorily impermissible, and therefore we need not necessarily address the separate common-law attenuation question presented in the certification. However, because of the split vote on the threshold statutory question, Justice Wilcox, Justice Prosser, and I join Part II of Chief Justice Abrahamson's opinion, in which she addresses *Bowen* and concludes that its factors have not been met. Justice Bradley also joins Part II of the chief justice's opinion on this second issue, which constitutes the opinion of the court. Justice Bablitch and Justice Crooks conclude that the *Bowen* factors have been met.

## I. FACTS AND PROCEDURAL HISTORY

¶ 4. Jared Finnegan was born on March 3, 1997. During the first week of August, 1997, Jared stayed with his grandparents while his parents, Tanice and Joseph Finnegan, spent their five-year anniversary in Florida. During that time, Jared developed a low-grade fever. When the Finnegans returned on August 4th, Jared was still running a slightly elevated temperature of about 99.5 degrees. Tanice gave him Tylenol to bring his temperature down.

¶ 5. The next day, Jared became increasingly fussy. By 10:00 p.m., his temperature was up to 103.1 and he continued to run high temperatures through the morning of August 6th. Alarmed by Jared's persistent, unexplained fever, Tanice took Jared to the Manitowoc Clinic, where he was seen by the Finnegans' pediatrician, Dr. Kevin Molteni. Dr. Molteni ordered a complete blood count ("CBC") and blood culture. When the CBC indicated that Jared's white blood cell count fell within the normal range, Dr. Molteni advised Tanice to take Jared home, and to alternate doses of Tylenol and Motrin to combat the fever.

¶ 6. After the Finnegans returned home from the Manitowoc clinic, Jared's temperature spiked to 104 degrees, but came down somewhat after Tanice gave him the Tylenol and Motrin. Throughout the day, Jared continued to be very irritable. That evening he had episodes of vomiting, and Tanice called Dr. Molteni at home to report on his condition. Dr. Molteni advised Tanice to discontinue the Tylenol and to either phone the on-call physician or go to the emergency department if Jared got worse. Jared eventually fell asleep.

¶ 7. When Jared awoke at approximately 7:00 a.m. on August 7, 1997, he was moaning and appeared lethargic. The Finnegans took Jared back to the Manitowoc Clinic at 8:30 a.m. Dr. Molteni noted that the results of Jared's blood culture showed bacteria in Jared's blood, and he told the Finnegans to immediately take Jared to the hospital for a lumbar puncture. Dr. Molteni indicated that the lumbar puncture would tell them whether the bacteria had entered Jared's spinal fluid. The Finnegans then drove Jared to Holy Family Hospital in Manitowoc, about five-to-ten minutes away.

¶ 8. The night before, on August 6, 1997, the laboratory had called Dr. Anne Schuette, who was

on-call for Dr. Molteni. The lab advised Dr. Schuette that Jared's blood culture, ordered earlier that day by Dr. Molteni, had come back positive for bacteria. Dr. Schuette, however, failed to relate this information to either Dr. Molteni or the Finnegans themselves. It was not until Tanice returned with Jared to the Manitowoc Clinic the next morning that Dr. Molteni reviewed the test results.

¶ 9. Upon arriving at the hospital, Joseph Finnegan dropped Tanice and Jared off at the front door and Tanice took Jared up the elevator to the pediatric ward. Jared stopped breathing on the elevator. When Tanice entered the pediatric ward, she immediately called for the nurse's attention and the nurse motioned for her to take Jared into a room. Noting that Jared wasn't breathing, the nurse called a "code blue" and several hospital staff members rushed to help.

¶ 10. Tanice remained with Jared throughout and was asked to leave the room only when Dr. Molteni arrived to do the lumbar puncture. After performing the procedure, Dr. Molteni came out to Tanice and informed her that Jared's spinal fluid was cloudy and that a flight team was on its way from Children's Hospital in Milwaukee. When the flight team arrived, Jared was stabilized and prepared for the flight to Milwaukee. The Finnegans followed the helicopter by car. By the time Jared got to Children's Hospital, however, his infection had progressed too far and the doctors were unable to save his life. Jared died at Children's Hospital on August 7, 1997.

¶ 11. The Finnegans initially filed an action for wrongful death in Manitowoc County Circuit Court, alleging medical malpractice on the part of Dr. Schuette, Aurora Medical Group's on-call physician, based upon her failure to act upon the August 6th

laboratory results. The Finnegans and Aurora Medical Group have settled the wrongful death claim for an undisclosed amount.

¶ 12. The Finnegans amended their complaint to assert an additional claim for negligent infliction of emotional distress under *Bowen,* arising out of the malpractice. This is the only remaining claim in the lawsuit.

¶ 13. Aurora moved for summary judgment to dismiss the negligent infliction of emotional distress claim, asserting that: 1) *Bowen*-type claims for emotional distress are not cognizable in actions arising from medical malpractice, which are governed exclusively by Chapter 655; and 2) even if bystander claims for emotional distress are statutorily permitted, *Bowen* itself precludes the Finnegans' claim.

¶ 14. The circuit court, the Honorable Fred H. Hazlewood, denied Aurora's motion for summary judgment, concluding that Chapter 655 recognizes *Bowen* claims for negligent infliction of emotional distress and that the Finnegans' claim for negligent infliction of emotional distress was not precluded by *Bowen* itself. The court of appeals granted Aurora's petition for interlocutory appeal, and certified the case to this court. We granted the certification to determine whether the Finnegans' bystander mental distress claim is permitted by Chapter 655, and if so, whether the claim is cognizable under *Bowen* itself. We now reverse.

## II. STANDARD OF REVIEW

■

¶ 15. The first certified issue is whether Chapter 655 permits bystander claims for negligent infliction of emotional distress in medical malpractice actions. This

is a question of statutory interpretation, subject to de novo appellate review. *Czapinski v. St. Francis Hosp.*, 2000 WI 80, ¶ 12, 236 Wis. 2d 316, 613 N.W.2d 120 (citing *Burks v. St. Joseph's Hosp.*, 227 Wis. 2d 811, 824, 596 N.W.2d 391 (1999)).

## III. DISCUSSION

¶ 16. Wisconsin common law has "historically distrusted emotion" as the sole basis for a compensable tort claim. *Bowen*, 183 Wis. 2d at 638. For many years, courts treated the tort of negligent infliction of emotional distress with skepticism, devising "various criteria to balance a plaintiff's compensatory interests for emotional distress with the interests of the judicial system in authenticating claims and preventing unlimited liability for the tortfeasor." *Id.* at 640. Accordingly, our cases imposed rules limiting bystander emotional distress recovery to plaintiffs who 1) were in the "zone of danger" of the underlying accident or injury; 2) feared for their own safety; and 3) suffered physical injury in tandem with the emotional distress. *Id.* at 648.

¶ 17. *Bowen* eliminated these "rigid doctrinal limitations" on tort liability for bystander claims for negligent infliction of emotional distress. *Id.* at 651. *Bowen* held that "the traditional elements of a tort action in negligence—negligent conduct, causation and injury (here severe emotional distress)—should serve as the framework for evaluating a bystander's claim of negligent infliction of emotional distress." *Id.* at 652–53.

¶ 18. *Bowen* reiterated, however, the recurrent concerns about emotional distress claims: "Historically, the tort of negligent infliction of emotional distress has raised two concerns: (1) establishing authenticity of the claim and (2) ensuring fairness of the financial burden

placed upon a defendant whose conduct was negligent." *Id.* at 655. Accordingly, the court in *Bowen* adopted three elemental requirements and applied a public policy analysis in order to "help assure that the claim . . . is genuine, that allowing recovery is not likely to place an unreasonable burden upon the defendant, and that allowance of recovery will not contravene" public policy. *Id.* at 656.

¶ 19. The three prerequisites to a *Bowen* bystander claim for negligent infliction of emotional distress are: 1) the injury suffered by the victim must have been fatal or severe; 2) the claimant must be related to the victim as a spouse, parent, child, grandparent, grandchild, or sibling; and 3) the claimant must have witnessed the incident causing death or serious injury or "the gruesome aftermath of such an event minutes after it occurs." *Id.* at 656–58. In addition to these basic limitations, the court in *Bowen* said that liability for negligent infliction of emotional distress (like liability in ordinary negligence cases) may be precluded as a matter of law by considerations of public policy:

> A court deals with . . . concerns [about claim authenticity and fairness to the defendant] by exploring in each case such public policy considerations as: (1) whether the injury is too remote from the negligence; (2) whether the injury is wholly out of proportion to the culpability of the negligent tortfeasor; (3) whether in retrospect it appears too extraordinary that the negligence should have brought about the harm; (4) whether allowance of recovery would place an unreasonable burden on the negligent tortfeasor; (5) whether allowance of recovery would be too likely to open the way to fraudulent claims; or (6) whether allowance of recovery would enter a filed that has no sensible or just stopping point.

*Id.* at 655.

¶ 20. The Finnegans' bystander claim for negligent infliction of emotional distress is premised upon having witnessed the physical deterioration and death of their son as a result of an act of medical malpractice. Medical malpractice is governed by Chapter 655 of the Wisconsin Statutes, enacted in 1975 to "control[] all claims for death or injury resulting from medical malpractice." *Czapinski,* 236 Wis. 2d 316, ¶ 18. Chapter 655 "provides medical patients a recourse for health care liability and establishes the Patients Compensation Fund."[2] *Id.,* ¶ 14.

¶ 21. We have previously recognized the legislative purposes that led to the enactment of Chapter 655:

> The legislature cited a sudden increase in the number
> of malpractice suits, in the size of awards, and in

---

[2] Wisconsin Statute § 655.27 "create[s] a patients compensation fund for the purpose of paying that portion of a medical malpractice claim which is in excess of [the limits expressed in the chapter]" for "paying future medical expense payments under § 655.015" and for "paying claims under" § 655.27(1m). The fund "provide[s] occurrence coverage for claims against health care providers that have complied with th[e] chapter, and against employees of those health care providers, and for reasonable and necessary expenses incurred in payment of claims and fund administrative expenses." The chapter provides a detailed outline for the administration of the fund, including "Peer Review Activities," § 655.27(1m); "Fund Administration and Operation," § 655.27(2); Fee Assessment, Establishment, Limitation, and Collection, § 655.27(3); "Fund Accounting and Audit," § 655.27(4); "Claims Procedures," § 655.27(5); a legislatively designated "Integrity of [the] Fund" which ensures that it "shall be held in trust for the purposes of th[e] chapter and may not be used for purposes other than those of th[e] chapter," § 655.27(6); and, finally, for "Actions Against Insurers, Self-insurers, or Providers." § 655.27(7).

malpractice insurance premiums, and identified several impending dangers: increased health care costs, the prescription of elaborate "defensive" medical procedures, the unavailability of certain hazardous services and the possibility that physicians would curtail their practices.

*Id.* (citing *State ex rel. Strykowski v. Wilkie,* 81 Wis. 2d 491, 508, 261 N.W.2d 434 (1978)). Thus, Chapter 655 was intended to limit, not expand, medical malpractice liability. *Northwest General Hosp. v. Yee,* 115 Wis. 2d 59, 64, 339 N.W.2d 583 (1983).

¶ 22. It is now firmly established that Chapter 655 constitutes the exclusive procedure and remedy for medical malpractice in Wisconsin. *Czapinski,* 236 Wis. 2d 316, ¶ 14; *Rineck v. Johnson,* 155 Wis. 2d 659, 665, 456 N.W.2d 336 (1990);[3] *Strykowski,* 81 Wis. 2d at 499; *Ziulkowski v. Nierengarten,* 210 Wis. 2d 98, 102, 565 N.W.2d 164 (Ct. App. 1997). Accordingly, any claim for negligent infliction of emotional distress arising out of medical malpractice must find expression within the statutory framework of Chapter 655.

¶ 23. Wisconsin Statutes § 655.005(1) provides:

Any person listed in s. 655.007 having a claim or a derivative claim against a health care provider or an employee of the health care provider, for damages for bodily injury or death due to acts or omissions of the employee of the health care provider acting within the scope of his or her employment and providing health care services, is subject to this chapter.

¶ 24. Wisconsin Statutes § 655.007 states:

---

[3] *Rineck v. Johnson,* 155 Wis. 2d 659, 665, 456 N.W.2d 336 (1990), was overruled on other grounds in *Chang v. State Farm Mut. Auto. Ins. Co.,* 182 Wis. 2d 549, 514 N.W.2d 399 (1994).

On and after July 24, 1975, any patient or the patient's representative having a claim or any spouse, parent, minor sibling or child of the patient having a derivative claim for injury or death on account of malpractice is subject to this chapter.

¶ 25. As a primary matter, neither Wis. Stat. § 655.005 nor Wis. Stat. § 655.007 specifically describes a *Bowen*-type claim for emotional distress or confers standing on a bystander to bring such a claim in a medical malpractice lawsuit. Section 655.005(1) refers to all claims or derivative claims "for damages for bodily injury or death," and Wis. Stat. § 655.007 refers to the claims of patients and the derivative claims of specified relatives "for injury or death on account of malpractice." Emotional distress claims arising from witnessing an injury-causing event as a related bystander constitute an entirely different class of claim and are not mentioned.

¶ 26. The statutes specify that a relative's claim must be derivative to fall within the scope of allowable medical malpractice recovery, and only certain relatives are included. *See* Wis. Stat. § 655.007 ("[A]ny spouse, parent, minor sibling or child of the patient having a derivative claim for injury or death on account of malpractice is subject to this chapter."); Wis. Stat. § 655.005(1) ("Any person listed in s. 655.007 having a claim or a derivative claim against a health care provider . . . is subject to this chapter."). Our jurisprudence outlines the types of claims that are considered derivative. Claims for the loss of society, companionship, and consortium are derivative even though they technically "belong" to the close relative making the claim. *Korth v. Am. Family Ins. Co.*, 115 Wis. 2d 326, 331, 340 N.W.2d 494 (1983) (a parent's claim for loss of society and

companionship with a child is derivative); *Peeples v. Sargent,* 77 Wis. 2d 612, 643, 253 N.W.2d 459 (1977) (a claim for loss of consortium is derivative personal injury right which does not pass to bankruptcy trustee); *Richie v. Am. Family Mut. Ins. Co.,* 140 Wis. 2d 51, 56, 409 N.W.2d 146 (Ct. App. 1987)([A] claim for loss of consortium is derivative in that "it derives from physical or mental injuries suffered by a family member.").

¶ 27. In contrast, a claim for negligent infliction of emotional distress is not considered derivative; although it arises from a shared set of underlying facts, as do loss of society, companionship, or consortium claims, negligent infliction of emotional distress is an independent tort injury suffered by the bystander himself or herself as a result of the shock of having witnessed an extraordinary and traumatic event. *Bowen,* 183 Wis. 2d at 657–58. As we explained in *Bowen:*

> The emotional harm from the serious injury or loss of a spouse, parent, child, grandparent, grandchild or sibling *is not the harm compensated in this tort.* The shock of seeing efforts to save the life of an injured spouse in an ambulance or hospital, for example, will not be compensated because it is a life experience that all may expect to endure. The compensable serious emotional distress of a bystander under the tort of negligent infliction of emotional distress is not measured by the acute emotional distress of the loss of the family member. Rather the damages arise from the bystander's observance of the circumstances of the death or serious injury, either when the incident occurs or soon after."

589

*Bowen,* 183 Wis. 2d at 659–60 (emphasis added). A *Bowen* claim for negligent infliction of emotional distress does not depend on the primary tort victim's ability to make the claim.

¶ 28. A plaintiff who sues for negligent infliction of emotional distress under *Bowen* is asserting that he or she has been the victim of an independent tort, not that he or she has a separate but dependent damages claim deriving from a tort injury to another, as in a derivative claim such as loss of consortium or society and companionship. We have held that a parent's derivative claim for loss of society and companionship must be joined with the child's personal injury claim. *See Shockley v. Prier,* 66 Wis. 2d 394, 404, 225 N.W.2d 495 (1975). Unlike a *Bowen* bystander claim, a derivative claim for loss of consortium or loss of society and companionship does not have its own elements distinct from the negligence claim to which it attaches; juries are instructed that loss of consortium or loss of society and companionship are categories of damages, not separate negligence inquiries. *See* Wis JI—Civil 1815 (loss of consortium), 1837 (parent's loss of society and companionship), 1838 (minor child's loss of society and companionship)(all appearing in the jury instruction manual under the subheading "Damages").

¶ 29. A *Bowen* bystander claim, as has been noted, has its own separate and distinct elements and rigorous proof prerequisites. *See, supra,* ¶¶ 16–18. A *Bowen* claim for negligent infliction of emotional distress is not merely a separate but dependent damages claim attaching to the primary negligence claim, but, rather, is a distinct and independent tort, on which the jury is separately instructed and must make separate,

elemental findings in the special verdict.
*See* Wis JI—Civil 1510 (negligent infliction of emotional distress) (classified in the jury instruction manual among the negligence instructions, not the damages instructions).

¶ 30. Thus, I conclude (joined by Justices Wilcox and Prosser) that a claim for negligent infliction of emotional distress under *Bowen* is independent, not derivative; as such, a *Bowen* claim premised upon medical malpractice is not recognized in Chapter 655. *See Kosieradzki v. Matheys,* 2002 WI App 191, ¶ 10, 256 Wis. 2d 839, 649 N.W.2d 717 (concluding that under *Bowen,* "emotional distress claims are independent, not derivative"). Because Chapter 655 exclusively governs all claims arising out of medical malpractice, and because the legislature did not include *Bowen*-type claims in Wis. Stat. §§ 655.005(1) or 655.007, I conclude (joined by Justices Wilcox and Prosser) that negligent infliction of emotional distress claims arising out of medical malpractice are not actionable under Wisconsin law.[4]

---

[4] Chief Justice Abrahamson's opinion contends that negligent infliction of emotional distress arising out of medical malpractice is actionable as "a valid tort claim outside chapter 655," citing *Johnson v. Rogers Memorial Hospital, Inc.,* 2001 WI 68, 244 Wis. 2d 364, 627 N.W.2d 890; *McEvoy v. Group Health Cooperative of Eau Claire,* 213 Wis. 2d 507, 570 N.W.2d 397 (1997); and *Northwest General Hospital v. Yee,* 115 Wis. 2d 59, 339 N.W.2d 583 (1983). Chief Justice Abrahamson's opinion, ¶¶ 47–50. *Yee* was a contract action on a medical debt. *Yee,* 115 Wis. 2d at 66. *McEvoy* was a bad faith insurance claim against an HMO. *McEvoy,* 213 Wis. 2d at 513. Neither case involved a claim for personal injury arising out of or premised upon medical malpractice. In *Johnson,* the plaintiff parents sued

■■■■

¶ 31. Furthermore, Wis. Stat. § 893.55 does not, as the Finnegans contend, operate to expand the categories of claims or claimants allowed by Chapter 655 to encompass *Bowen* bystander claims arising out of medical malpractice. Entitled "Medical malpractice; limitation of actions; limitation of damages; itemization of damages," Wis. Stat. § 893.55 details certain procedural and substantive limits placed upon medical malpractice actions in this state. Specifically, Wis. Stat. § 893.55(1), (2), and (3) contain statutes of limitation for medical malpractice actions; subsection (4) specifies monetary limits on non-economic damages; subsection (5) requires an itemization of the categories of damages awarded in the special verdict; subsection (6) incorporates the rules of contributory negligence into medical malpractice actions; and subsection (7) alters the collateral source rule for purposes of medical malpractice actions. Thus, the provisions of Wis. Stat. § 893.55 enumerate and limit the damages that may be collected in medical malpractice actions which, as a primary matter, remain governed by Chapter 655.

---

their adult daughter's therapists on negligence and contract theories for allegedly implanting false memories about childhood abuse. We only very summarily addressed the applicability of Chapter 655 in *Johnson*, citing *Sawyer v. Midelfort*, 227 Wis. 2d 124, 595 N.W.2d 423 (1999), and *Schuster v. Altenberg*, 144 Wis. 2d 223, 424 N.W.2d 159 (1988), for the proposition that "such claims . . . [may] move forward outside the realm of chapter 655." *Johnson*, 244 Wis. 2d 364, ¶ 20. However, neither *Sawyer* nor *Schuster* specifically addressed the applicability or exclusivity of Chapter 655. Accordingly, because *Johnson*'s treatment of the issue was very cursory and was based entirely on two cases that did not even address the issue, I conclude that *Johnson* is neither helpful nor controlling here.

¶ 32. More specifically, Wis. Stat. § 893.55(4)(a) defines "noneconomic damages" as compensation for "pain and suffering; humiliation; embarrassment; worry; mental distress; noneconomic effects of disability including loss of enjoyment of the normal activities, benefits and pleasures of life and loss of mental or physical health, well-being or bodily functions; loss of consortium, society and companionship; or loss of love and affection." Wisconsin Statute § 893.55(5) provides that:

> Every award of damages under ch. 655 shall specify the sum of money, if any, awarded for each of the following for each claimant:
>
> (a) Pain, suffering and noneconomic effects of disability.
>
> (b) Loss of consortium, society and companionship or loss of love and affection.
>
> (c) Loss of earnings or earning capacity.
>
> (d) Each element of medical expenses.
>
> (e) Other economic injuries and damages.

¶ 33. While Wis. Stat. § 893.55(4) enumerates "mental distress" as a noneconomic damage in a medical malpractice action, that section does not specifically address *whose* mental distress is included. However, loss of consortium, society, and companionship and loss of love and affection—the categories of damages traditionally recoverable by close relatives in derivative claims—are listed separately in Wis. Stat. § 893.55(4). Loss of consortium, society, companionship, love, and affection are also listed separately in Wis. Stat. § 893.55(5); the statute specifies that damages for the patient's "pain, suffering and noneconomic effects of

disability" is to be itemized separately from the relative's damages for "loss of consortium, society and companionship or loss of love and affection." Wis. Stat. § 893.55(5)(a) and (b). We note that Wis. Stat. § 893.55(5)(b) makes no mention of "mental distress" damages, instead listing only "loss of consortium, society and companionship, or loss of love and affection." Wis. Stat. § 893.55(5)(b). Thus, the legislature has distinguished between damages that are recoverable by the patient and those that are recoverable by the patient's relatives. Relatives' recovery is confined to damages for loss of consortium, society, companionship, love, and affection, and does not include mental distress damages associated with an independent *Bowen* tort claim.

¶ 34. In *Czapinski* we rejected the argument that Wis. Stat. § 893.55 operates to expand the class of claimants entitled to recover for medical malpractice under Chapter 655. *Czapinski,* 236 Wis. 2d 316, ¶¶ 13, 19. *Czapinski* held that adult children do not have standing to sue for loss of society and companionship arising out of medical malpractice under Wis. Stat. § 655.007, and also concluded that Wis. Stat. § 893.55 does not operate to confer standing or expand the allowable scope of medical malpractice claims or claimants under Chapter 655. *Id.*

¶ 35. Similarly here, Wis. Stat. § 893.55 does not authorize bystander claims for negligent infliction of emotional distress arising out of medical malpractice where such claims are otherwise impermissible under Chapter 655. Wisconsin Statute § 893.55 limits recoverable damages in medical malpractice actions and requires separate itemization of each element of damage. Wis. Stat. § 893.55(4) and (5). The statute does not

594

expand the scope or nature of medical malpractice liability beyond that which is permitted by Chapter 655.

¶ 36. This conclusion is consistent with the court of appeals' decision in *Ziulkowski*, 210 Wis. 2d at 102–06. *Ziulkowski* presented the narrower question of whether adult children of victims of medical malpractice can maintain a *Bowen* claim for negligent infliction of emotional distress. The court of appeals concluded that neither *Bowen* nor Chapter 655 permits such a claim. *Ziulkowski*, 210 Wis. 2d at 102, 106. The question in this case is broader, and my analysis differs somewhat from the analysis in *Ziulkowski;* nevertheless, *Ziulkowski*'s conclusion is consistent with the conclusion reached here.

¶ 37. In Chapter 655, the legislature has established an exclusive framework for medical malpractice litigation in this state, and has limited the classes of allowable claims and eligible claimants. I conclude that neither Wis. Stat. §§ 655.005 nor 655.007 explicitly or implicitly allows a *Bowen*-type bystander claim for negligent infliction of emotional distress. Wisconsin Statute § 893.55 enumerates and limits the types of damages that are recoverable when authorized by Chapter 655 in the first instance; it does not operate to expand the classes of allowable claims or eligible claimants under Chapter 655. I conclude that the independent bystander tort of negligent infliction of emotional distress is not actionable in the medical malpractice context.

¶ 38. As a result of our conclusion on the statutory question, Justices Wilcox, Prosser, and I need not necessarily resolve the second certified question, which presents a common-law issue regarding the scope of *Bowen*. Specifically, the second certified question is whether a bystander claim for negligent infliction of

emotional distress can be made where there is some attenuation between the injury-causing event and the physical deterioration and death from that injury, and where the claimant witnesses the deterioration and death of the victim, but not the injury-causing event or its immediate aftermath. Because the court is split on the statutory question, Justices Wilcox, Prosser, and I join Part II of Chief Justice Abrahamson's opinion, in which she addresses the *Bowen* issue and concludes that the *Bowen* factors are not met. Justice Bradley also joins Part II of the chief justice's opinion. Accordingly, the order of the circuit court is reversed.

*By the Court.*—The order of the Manitowoc County Circuit Court is reversed.

¶ 39. I am authorized to state that Justices JON P. WILCOX and DAVID T. PROSSER, JR. join this opinion.

¶ 40. SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE *(concurring).* I conclude that if a parent's claim of negligent infliction of emotional distress resulting from medical malpractice in treating his or her child is an independent cause of action, the claim can be brought outside chapter 655.

¶ 41. Nevertheless, I conclude that the "bystander claim"[1] urged by the parent in this case cannot proceed because it does not fall within the requirements of

---

[1] "Bystander claim" refers to the claim of a plaintiff who alleges emotional distress arising from a tortfeasor's negligent infliction of physical harm on a third person. *Bowen v. Lumbermen's Mut. Cas. Co.,* 183 Wis. 2d 627, 632, 517 N.W.2d 432 (1994).

*Bowen v. Lumbermen's Mutual Casualty Co.,* 183 Wis. 2d 627, 517 N.W.2d 432 (1994).[2]

¶ 42. I would therefore reverse the order of the Circuit Court for Manitowoc County.

I

¶ 43. Justice Sykes's lead opinion concludes that chapter 655 constitutes the exclusive procedure and remedy for medical malpractice in Wisconsin, and that a parent's claim against a health care provider for negligent infliction of emotional distress resulting from medical malpractice in treating his or her child must be dismissed because the claim does not fall within the list of claims covered by chapter 655, specified in Wis. Stat. §§ 655.005(1)[3] and 655.007.[4]

¶ 44. The lead opinion reasons that a parent's claim of negligent infliction of emotional distress resulting from medical malpractice in the treatment of his or her child is not covered by chapter 655 as follows: (1) a parent's claim is not for medical malpractice and is

---

[2] Justices Wilcox, Bradley, Prosser, and Sykes join this sentence and Part II of the opinion. Part II is the majority opinion.

[3] Wisconsin Stat. § 655.005(1) provides:

Any person listed in s. 655.007 having a claim or a derivative claim against a health care provider or an employee of the health care provider, for damages for bodily injury or death due to acts or omissions of the employee of the health care provider acting within the scope of his or her employment and providing health care services, is subject to this chapter.

[4] Wisconsin Stat. § 655.007 provides:

On and after July 24, 1975, any patient or the patient's representative having a claim or any spouse, parent, minor sibling or child of the patient having a derivative claim for injury or death on account of malpractice is subject to this chapter.

independent of his or her child's claim, that is, it is not a derivative suit;[5] (2) chapter 655 explicitly states that

[5] The lead opinion's conclusion that a parent's claim for negligent infliction of emotional distress is an independent, not derivative, claim is suspect. The court of appeals has held that an adult child's suit against a health care provider for negligent infliction of emotional distress arising from medical malpractice in the care of a parent was not within Wis. Stat. § 655.007. *See Ziulkowski v. Nierengarten,* 210 Wis. 2d 98, 104–06, 565 N.W.2d 164 (Ct. App. 1997). The adult child plaintiff was barred from bringing suit in *Ziulkowski* because derivative claims were held to be limited to minor children under chapter 655. *Id.* The implication is that a suit for negligent infliction of emotional distress is a derivative suit.

*But see Kosieradzki v. Mathys,* 2002 WI App 191, ¶ 10, 256 Wis. 2d 839, 649 N.W.2d 717 (concluding that under *Bowen,* "emotional distress claims are independent, not derivative"). The lead opinion at ¶ 27 cites to and quotes from *Bowen,* but *Bowen* does not address or decide the question whether the claim for emotional distress is independent or derivative.

The lead opinion attempts to distinguish a claim for loss of society (which the lead opinion characterizes as derivative) from a claim for negligent infliction of emotional distress (which the lead opinion characterizes as independent) to support its suspect conclusion. The distinction between derivative and independent actions is, however, neither crystal clear nor absolute. Indeed the distinction appears to depend on the purpose for which the distinction is being made; the characterization depends on whether the court is addressing, for example, contributory negligence, limits on amount of recovery, or statutes of limitations. *See, e.g., Korth v. Am. Family Ins. Co.,* 115 Wis. 2d 326, 340 N.W.2d 494 (1983):

> The minor's cause of action for physical injury and the parents' causes of action for the invasion of the parents' interests are separate in the sense that each is predicated upon the invasion of different interests of different persons. The parents' claims are derivative, however, in the sense that they arise from the same tortious act that inflicted injury upon the child. . . . labels are not

## it applies only to patients or patients' representatives

> helpful in deciding the particular questions that come before the court. The preferred approach is to examine the legal context in which the question . . . arises . . . .

*id.* at 331; *Peeples v. Sargent,* 77 Wis. 2d 612, 253 N.W.2d 459 (1977):

> The cause of action for consortium occasioned by an injury to one marriage partner is a separate cause of action belonging to the spouse of the injured marriage partner. A wife's loss of consortium is derivative "in the sense it arose out of or was occasioned by an injury to her husband." However, loss of consortium is a direct injury to the spouse who has lost the consortium.

*id.* at 643 (citations omitted); *White v. Lunder,* 66 Wis. 2d 563, 225 N.W.2d 442 (1975):

> [T]hat the question of whether a spouse's cause of action for loss of consortium arising in personal injury actions is derivative is not clearly settled and the cases are confusing.
>
> We deem it appropriate to declare, for the purpose of applying our comparative negligence statute, that both the causes of action for medical expenses and loss of consortium shall be deemed derivative.
>
> To declare both of these causes of action derivative might not be entirely logical . . . .

*id.* at 574; *Schwartz v. Milwaukee,* 54 Wis. 2d 286, 195 N.W.2d 480 (1972):

> [T]he wife's action [for loss of consortium] was derivative only in the sense it arose out of or was occasioned by an injury to her husband. This is not the usual meaning of the word "derivative" and it might be more accurate to say a wife's damage was dependent upon the husband's injury and her cause of action must include the common factor of the accident and injury to her husband.

*id.* at 293; *Lord v. Hubbell,* 210 Wis. 2d 150, 168, 563 N.W.2d 913 (Ct. App. 1997) ("we are mindful that we are to look beyond the labels of 'derivative' and 'separate' claims").

having a malpractice claim and to specified persons having a derivative claim for death on account of malpractice; and (3) in the present case, the parent suing for negligent infliction of emotional distress (rather than for injury to the child) is not a patient, is not a patient's representative, and is not suing on a derivative claim on account of malpractice.[6]

¶ 45. Taking the lead opinion at its word, I fail to understand how it can then conclude that a parent's negligent infliction of emotional distress claim is "impermissible" under chapter 655. The only explanation I can come up with for its conclusion is that it assumes that the legislature intended to sweep away all claims having a connection with medical malpractice unless the claim is specifically included in the scope of chapter 655.

¶ 46. To the contrary, however, several of our cases hold that chapter 655 does not govern every claim having a connection with medical malpractice. Claims having a connection with medical malpractice can be brought outside chapter 655.

¶ 47. For example, in *Johnson v. Rogers Memorial Hospital, Inc.*, 2001 WI 68, 244 Wis. 2d 364, 627 N.W.2d 890, this court held that parents may sue their child's therapists for negligent infliction of emotional distress resulting from malpractice in treating the child. The therapists argued that the claims were barred because they did not fall within the scope of chapter 655, but

---

[6] This claim is not a medical malpractice claim per se because a medical malpractice claim arises when there is a physician-patient relationship. *Ande v. Rock*, 2002 WI App 136, ¶ 10, 256 Wis. 2d 365, 647 N.W.2d 265. In the present case, a physician-patient relationship does not exist between the complaining parent and the doctor. The child was the physician's patient.

this court allowed the claims "to move forward outside the realm of chapter 655" because "chapter 655 is not the exclusive remedy for such claims . . . ."[7]

¶ 48. In another case, *McEvoy v. Group Health Cooperative of Eau Claire,* 213 Wis. 2d 507, 570 N.W.2d 397 (1997), the court allowed a suit for the tort of bad faith against a health maintenance organization, refusing to accept the organization's argument that it could not be sued because the suit was subject to chapter 655. The court concluded, "[T]he legislature did not intend [in chapter 655] to go beyond regulating claims for medical malpractice," defining medical malpractice as "professional misconduct or unreasonable lack of skill."[8]

¶ 49. In still another case, *Northwest General Hospital v. Yee,* 115 Wis. 2d 59, 339 N.W.2d 583 (1983), the court refused to read chapter 655 as governing all claims involving medical malpractice against a health care provider, allowing a patient to assert the defense of medical malpractice in a health care provider's suit for payment for services rendered. The health care provider argued that the patient was asserting a claim for malpractice but not for bodily injury, and that the claim was not within the scope of chapter 655 and was thus prohibited. Examining the words of the statute and the legislative purpose, the court concluded that if the malpractice claim was not a claim for bodily injury, it

[7] *Johnson v. Rogers Mem'l Hosp., Inc.,* 2001 WI 68, ¶¶ 17, 20, 244 Wis. 2d 364, 627 N.W.2d 890. The *Johnson* court cited *Sawyer v. Midelfort,* 227 Wis. 2d 124, 595 N.W.2d 423 (1999), as another case allowing third party claims for negligent infliction of emotional distress in the medical malpractice arena. In *Sawyer* the allegation was that the child's false accusations of the parent's sex abuse caused harm to the parent.

[8] *McEvoy v. Group Health Coop. of Eau Claire,* 213 Wis. 2d 507, 527–30, 570 N.W.2d 397 (1997).

did not fall within chapter 655 and therefore was not barred. According to the court, contract law would apply regardless of chapter 655.

¶ 50. That the parent's claim for negligent infliction of emotional distress falls outside of chapter 655 does not mean that the claim is barred. Rather, it means that the claim may be a valid tort claim outside chapter 655. Thus, the proper conclusion for the lead opinion to reach (assuming that the claim is independent) is that chapter 655 does not govern a parent's claim for negligent infliction of emotional distress from a health care provider's negligent infliction of physical harm on a third person.

## II

¶ 51. Assuming arguendo that a parent's claim for negligent infliction of emotional distress resulting from medical malpractice is not barred by chapter 655, I conclude that summary judgment for the defendant was appropriate here. This case is a bystander case, unlike the court's other cases described above concerning a third party's claims for negligent infliction of emotional distress involving medical malpractice. The leading case on a tortfeasor's liability to a bystander is *Bowen v. Lumbermen's Mutual Casualty Co.,* a case not involving medical malpractice.

¶ 52. In *Bowen,* this court set forth three factors for determining whether a plaintiff could recover on his or her bystander claim for negligent infliction of emotional distress: (1) that "the injury suffered by the victim must have been fatal or severe"; (2) that "the victim and the plaintiff must be related as spouses, parent-child, grandparent-grandchild or siblings"; and

(3) that "the plaintiff must have observed an extraordinary event, namely the incident and injury or the scene soon after the incident with the injured victim at the scene."[9] In bystander cases, a court rules on these factors on a case-by-case basis.[10]

¶ 53. The parties dispute whether the case at bar satisfies the third factor. I conclude that the claim in the present case does not fit within the third factor.

¶ 54. The parent's experiences were horrific. The mother witnessed a prolonged and unsuccessful attempt to save their baby's life. In the context of *Bowen,* however, the compensable serious emotional distress of a bystander is not measured by the acute emotional distress of the loss of a family member. Rather, the damages arise from the bystander's observation of an extraordinary event. The hallmark of negligent infliction of emotional distress is a contemporaneous or nearly contemporaneous sensory perception of a sudden, traumatic, injury-producing event. "Witnessing either an incident causing death or serious injury or the gruesome aftermath of such an event minutes after it occurs is an extraordinary experience . . . ."[11]

¶ 55. In the present case, as in many cases, the failure to make the proper medical diagnosis is not an event that itself is perceived by a family member. To extend *Bowen* to an injury caused by an improper diagnosis when the plaintiff observes the suffering of the victim and not the event that causes that suffering conflicts with the historical foundations for negligent infliction of emotional distress and would be a significant broadening of the *Bowen* rule.

---

[9] *Bowen,* 183 Wis. 2d at 633.

[10] *Id.* at 660.

[11] *Id.* at 658.

603

¶ 56. For the reasons set forth, I would reverse the order of the Circuit Court for Manitowoc County.

¶ 57. I am authorized to state that Justices JON P. WILCOX, ANN WALSH BRADLEY, DAVID T. PROSSER, JR., and DIANE S. SYKES join Part II of this opinion.

¶ 58. WILLIAM A. BABLITCH, J. *(dissen-.ting)*. The majority holding in this case, authored by Chief Justice Abrahamson, is that the Finnegans' claim does not fit within the third factor in *Bowen*. I disagree and will address this issue first. The lead opinion, authored by Justice Sykes, concludes that the Finnegans' claim is not permissible under chapter 655 because it is not derivative. I disagree and will address this issue second.

I

¶ 59. The majority holding, which concludes that *Bowen* does not permit recovery in this case, is simply wrong. The majority holding does not, because it cannot, articulate a principled distinction between the facts in this case and the facts in *Bowen*.

¶ 60. *Bowen* set forth three factors for determining whether a bystander may recover for negligent infliction of emotional distress: (1) the injury suffered by the victim must have been fatal or severe; (2) the victim and the plaintiff must be related as spouses, parent-child, grandparent-grandchild or siblings; and (3) the plaintiff must have observed an extraordinary event, namely the incident and injury, or the scene soon after the incident with the injured victim at the scene. *Bowen v. Lumbermen's Mut. Cas. Co.,* 183 Wis. 2d 627, 633, 517 N.W.2d 432 (1994). In sum, the court in *Bowen* concluded that

> [T]o determine on the basis of public policy consider-
> ations whether to preclude liability for severe emo-
> tional distress to a bystander a court must consider
> three factors: the severity of the injury to the victim,
> the relationship of the plaintiff to the victim, and the
> extraordinary circumstances surrounding the
> plaintiff's discovery of the injury. These factors relate to
> the underlying principles of the tort; they are relevant
> to measuring the authenticity of the claim and the
> limits of liability for emotional harm resulting from a
> defendant's negligence. Courts must rule on these fac-
> tors and the public policy considerations on a case-by-
> case basis.

*Id.* at 660.

¶ 61. It is undisputed that the Finnegans satisfy the first two prongs of *Bowen:* (1) Jared died due to egregious medical malpractice and (2) Jared was the Finnegans' son. Only the third prong is at issue here: whether the Finnegans observed an extraordinary event—either witnessing an incident causing death or serious injury or the gruesome aftermath of such an event. *Bowen* reasoned that either witnessing an inci-dent causing death or serious injury or witnessing its aftermath was different from "learning of a family member's death through indirect means;" therefore, this "is an appropriate place to draw the line between recoverable and non-recoverable claims." *Id.* at 658. According to the majority holding, "the damages [for a *Bowen* claim of negligent infliction of emotional dis-tress] arise from the bystander's observation of an extraordinary event." Chief Justice Abrahamson's opin-ion, ¶ 54. In other words, "the damages arise from the bystander's observance of the circumstances of the death or serious injury, either when the incident [of negligence] occurs or soon after." *Bowen,* 183 Wis. 2d at 660. This is exactly what happened in this case.

605

¶ 62. Similar to the facts in *Bowen,* the Finnegans did not witness the negligent act that caused the death of their baby, but rather, they personally and directly experienced the traumatic aftermath. *See id.* at 657–58. Just as Sharon Bowen "saw her severely injured son trapped beneath the defendant's car . . . [and] watched the prolonged rescue attempt . . . ," the Finnegans directly experienced a prolonged attempt to save their dying baby's life. *Id.* at 634–35. The horrific experience of the Finnegans encompassed a series of events: receiving the news that the lab results of Jared's blood came back positive for bacteria and that this had been communicated to Dr. Schuette, who failed to notify them or act upon the results; observing Jared stop breathing when they were rushing him to the hospital for an emergency lumbar puncture; watching Jared stop breathing a second time while holding him in the hospital elevator; observing Jared change color and his head swelling; and finally witnessing Jared's death.

¶ 63. How can we say that recovery is allowed for witnessing the aftermath of a negligent act resulting in death or serious injury in a single incident, but not if one witnesses the aftermath through a series of incidents? If anything, it seems that witnessing multiple mind-numbing events due to a negligent act causing death or serious injury provides an even greater basis for recovery than witnessing just a single event. Regardless of whether the majority holding now believes that *Bowen* is too broad and should be limited, it is evident from comparing the facts in *Bowen* with those in the present case that if Sharon Bowen was allowed to recover, then the Finnegans should as well. There is no principled way to distinguish the two. Accordingly, I respectfully dissent.

## II

¶ 64. Second, I conclude that the Finnegans' claim is derivative and is therefore a permissible claim under chapter 655. The lead opinion concludes that a claim for emotional distress that is derived from the effects of medical malpractice on an immediate family member is not a "derivative" claim. This is contrary to the common and well-accepted meaning of the word derivative. It is also contrary to law and logic.

¶ 65. The term "derivative" has a common and well-accepted definition: "something that derives from, grows out of, or results from an earlier or fundamental state or condition." *Webster's International Dictionary* 608 (3d ed. 1961). A "derivative action" is defined as "[a] lawsuit arising from an injury to another person . . . ." *Black's Law Dictionary* 455 (7th ed. 1999). Although it is not necessarily absolute that an accepted definition of an English word has the same legal definition, it should give one at least great pause when the two are so diametrically opposed. To say that a claim derived from another is not derivative but is instead independent does strain credulity.

¶ 66. The lead opinion is also contrary to law and logic. The lead opinion cannot deny and indeed admits that claims for loss of consortium and loss of society and companionship are derivative claims. Further, the lead opinion acknowledges that a claim for negligent infliction of emotional distress is similar to claims for loss of consortium and loss of society and companionship, in that they all arise from a shared set of underlying facts. Lead op., ¶ 27. Nevertheless, the lead opinion treats them entirely different by reaching the conclusion that claims for loss of consortium, society and companionship are "derivative," but claims for negligent infliction

of emotional distress are "independent." Simply put, that does not logically, nor does it legally, follow.

¶ 67. The lead opinion attempts to make this distinction by asserting that "[a] *Bowen* claim for negligent infliction of emotional distress is not merely a separate but dependent damages claim attaching to the primary negligence claim . . . ." Lead op., ¶ 29.[1] In support, the lead opinion claims that unlike a derivative claim for loss of consortium or society and companionship, "a *Bowen* bystander claim . . . has its own separate and distinct elements . . . ." *Id.* While a *Bowen* claim does have distinct elements that must be met, so do claims for loss of consortium, society and companionship. In order to prevail on a claim for loss of consortium or society and companionship, a plaintiff must establish the existence of death or injury, and that the death or injury was caused by the defendant's negligent conduct. Theodore V. Lyons, Jr., "Loss of Consortium, Society and Companionship," *Law of Damages in Wisconsin,* vol. 2, § 14.6 (2000). In addition, such a claim "must be proved separately from the underlying claim in that distinct damages must be shown . . . ." *Giese v. Montgomery Ward, Inc.,* 111 Wis. 2d 392, 405, 331 N.W.2d 585 (1983).

---

[1] With respect to the lead opinion's reference to *Shockley v. Prier,* 66 Wis. 2d 394, 404, 225 N.W.2d 495 (1975), regarding the joinder of claims, we note that we have also held that while it is "preferable that the claims of both husband and wife for loss of consortium be joined . . . if this cannot be done because of procedural obstacles or the inability or unwillingness of the husband to assert his claim, the wife should not be prevented from pursuing her own independent cause of action." *Fitzgerald v. Meissner & Hicks, Inc.,* 38 Wis. 2d 571, 581, 157 N.W.2d 595 (1968).

¶ 68. Furthermore, similar to the current disagreement regarding the nature of *Bowen* claims for negligent infliction of emotional distress, early case law illustrates that there was also confusion regarding the "derivative" nature of claims for loss of consortium, society and companionship. For example, this court stated in 1975 that "it is apparent . . . that the question of whether a spouse's cause of action for loss of consortium . . . is derivative is not clearly settled and the cases are confusing." *White v. Lunder,* 66 Wis. 2d 563, 574, 225 N.W.2d 442 (1975). But ultimately, our case law has characterized claims for loss of consortium and loss of society and companionship as "derivative," based on reasoning that applies equally to *Bowen* claims for negligent infliction of emotional distress. *See, e.g., Kottka v. PPG Indus., Inc.,* 130 Wis. 2d 499, 521, 388 N.W.2d 160 (1986); *Korth v. Am. Family Ins. Co.,* 115 Wis. 2d 326, 331, 340 N.W.2d 494 (1983); *Gragg v. Am. Family Mut. Ins. Co.,* 2001 WI App 272, ¶ 12, 248 Wis. 2d 735, 637 N.W.2d 477.

¶ 69. Those cases, in contrast to the lead opinion's attempted distinction, described what makes a claim "derivative." "The claim for a loss of consortium is derivative, in the sense that it does not arise unless the other spouse has sustained a personal injury." *Kottka,* 130 Wis. 2d at 521 (citing *Fitzgerald v. Meissner & Hicks, Inc.,* 38 Wis. 2d 571, 579, 157 N.W.2d 595 (1968)). In the context of a claim for loss of society and companionship, we have stated that:

> The minor's cause of action for physical injury and the parents' causes of action for the invasion of the parents' interests are separate in the sense that each is predicated upon the invasion of different interests of different persons. The parents' claims are *derivative,*

however, in the sense that they arise from the same tortious act that inflicted injury upon the child.

*Korth,* 115 Wis. 2d at 331 (emphasis added). In other words, "*but for* [a] primary tort victim's personal injury, a claim for loss of society and companionship or for loss of consortium would not exist." Lyons, *Law of Damages in Wisconsin,* § 14.7 (emphasis added).

¶ 70. I see *no difference* in the derivative nature of claims for loss of consortium, society, and companionship and *Bowen* claims for negligent infliction of emotional distress—they all depend on and derive from the injury or death of someone else. Admittedly, the court of appeals has stated in dicta that "[i]n *Bowen v. Lumbermen's Mut. Cas. Co.,* 183 Wis. 2d 627, 517 N.W.2d 432 (1994), our supreme court . . . held that emotional distress claims are independent, not derivative." *Kosieradzki v. Mathys,* 2002 WI App 191, ¶ 10, 256 Wis. 2d 839, 649 N.W.2d 717. However, the court in *Bowen* did not address this issue, much less hold that claims for emotional distress are independent instead of derivative. *See* Chief Justice Abrahamson's opinion, ¶ 44 n.5.

¶ 71. In *Kosieradzki,* the court of appeals held that an insurance policy's "each person" limit applied instead of the "each accident" limit based on the terms of the insurance policy. The court acknowledged that its statement about *Bowen* was pure dicta, stating that "[h]ow the law defines particular claims is immaterial. At issue [in this case] is how the policy treats them, which is determined by the language of the policy." *Kosieradzki,* 256 Wis. 2d 839, ¶ 10.

¶ 72. Further, just because a claim is "derivative" does not mean that it cannot involve a separate and independent loss. As we reasoned in *Kottka,* even

though a claim, such as for the loss of society and companionship of a spouse, is derivative, it "is not for the other spouse's personal injury but for the *separate* and *independent* loss which the noninjured spouse sustains." *Kottka,* 130 Wis. 2d at 521 (emphasis added) (citing *Fitzgerald,* 38 Wis. 2d at 579).[2] Therefore, despite *Bowen's* distinction between the emotional harm due to serious injury or death of a family member and the emotional distress from observing a family member's death or serious injury, the relevant point is that both of these depend on and derive from the injury or death of someone else—i.e., they are both derivative. Thus, the statement in *Kosieradzki* that *Bowen* claims are independent is not only dicta, it is incorrect.

¶ 73. Accordingly, I respectfully dissent. Based on the above, I would hold that the Finnegans' claim is derivative and is therefore a permissible claim under chapter 655.

¶ 74. I am authorized to state that Justice N. PATRICK CROOKS joins this dissenting opinion.

■■■■■

---

[2] "An action may be considered 'derivative' in the sense that it is dependent on the existence of a separate claim based on injury to a family member, but it may be considered 'independent' in the sense that it must be based on a loss sustained personally by the parent." Robert Michael Ey, "Cause of Action by Parent for Loss of Child's Consortium," 7 Causes of Action 2d 319 (2003) (citing *Giese v. Montgomery Ward, Inc.,* 111 Wis. 2d 392, 331 N.W.2d 585 (1983)).